injunction, it will be free to seek a modification of the injunction from the district court at that time." *Ibid.*

Unlike in *Here's Johnny II*, Palazzetti is *already* operating in a state that does not recognize a post-mortem right of publicity. Moreover, its principal place of business is in that state. It would be unjust to impose Michigan law on Palazzetti's operations in New York and other states that have explicitly refused to recognize a post-mortem right of publicity. Therefore, we hold that the portion of the district court's injunction relating to Herman Miller's right of publicity claims shall be modified to exclude those states that explicitly do not recognize a post-mortem right of publicity.[16]

### V. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects except for: (1) the dismissal of Herman Miller's trade dress infringement and dilution claims, which is REVERSED with instructions that the issue of protectability is preserved for trial and the district court must address Palazzetti's affirmative defense of abandonment; and (2) the nationwide right of publicity injunction against Palazzetti, which must be modified to exclude those states that do not recognize a post-mortem right of publicity. This action is REMANDED to the district court for further proceedings not inconsistent with this opinion.

---

[16]The injunction shall continue to apply in all states that explicitly recognize a post-mortem right of publicity as well as those states that have not addressed the issue. Palazzetti has not requested that the latter states be excluded from the injunction. If a state subsequently makes an explicit pronouncement refusing to recognize a post-mortem right of publicity, Palazzetti is permitted to request a modification of the injunction upon a showing that its conduct is lawful under the law of that state. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 48 cmt. c. (1995).

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0377P (6th Cir.)
File Name: 01a0377p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HERMAN MILLER, INC.,
    *Plaintiff-Appellant/*
    *Cross-Appellee,*

    v.

PALAZZETTI IMPORTS AND
EXPORTS, INC.,
    *Defendant-Appellee/*
    *Cross-Appellant.*

Nos. 98-2363;
99-1019

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 96-60277—Barbara K. Hackett, Senior District Judge.

Argued: November 1, 2000

Decided and Filed: October 22, 2001

Before: KEITH, BOGGS, and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:** Randall G. Litton, PRICE, HENEVELD, COOPER, DEWITT & LITTON, Grand Rapids, Michigan, for Appellant. Samuel D. Littlepage, DICKINSON WRIGHT, PLLC, Washington, D.C., for Appellee.

**ON BRIEF:**  Randall G. Litton, Douglas H. Siegel, PRICE, HENEVELD, COOPER, DEWITT & LITTON, Grand Rapids, Michigan, for Appellant.  Samuel D. Littlepage, Jeffrey M. Petrash, DICKINSON WRIGHT, PLLC, Washington, D.C., for Appellee.

---

### OPINION

---

BOGGS, Circuit Judge.  "Beware of imitations," warned a poster designed by Charles Eames for Herman Miller, Inc. in 1963.  The poster instructed furniture customers to "enjoy the comfort of the real thing designed by Charles Eames for Herman Miller, Inc."  Over thirty years later, Herman Miller, Inc. ("Herman Miller") filed a complaint in federal district court against a furniture company, Palazzetti Imports & Exports, Inc. ("Palazzetti"), that it claims is producing imitations of a lounge chair and ottoman that Eames and his wife Ray designed for Herman Miller in 1956.

A jury returned a verdict in favor of Herman Miller on three of its claims: trademark infringement and dilution, unfair competition, and right of publicity.  The district court dismissed Herman Miller's remaining two claims: trade dress infringement and dilution and false advertising.  Both parties have appealed certain aspects of the district court's decisions.

Herman Miller appeals the dismissal of its trade dress and false advertising claims as well the damages limitation imposed by the district court on Herman Miller's trade dress claims.  In addition, it challenges a portion of the permanent injunction entered by the district court against Palazzetti, which allows Palazzetti to "fairly identify" Charles and Ray Eames as the original designers of the furniture reproduced by Palazzetti.

The appropriate geographic scope of an injunction issued to protect the right of publicity is complicated by the variations among state statutes and common law rules. . . . *The issuance of an injunction under state law prohibiting otherwise lawful conduct in another state raises serious concerns*.  Thus, although a court may have jurisdiction to grant broad relief, an injunction protecting the right of publicity should ordinarily be limited to conduct in jurisdictions that provide protection comparable to the former state.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 48 cmt. c (1995) (emphasis added).

In *Carson v. Here's Johnny Portable Toilets, Inc.*, this court rejected the defendant's argument that the district court abused its discretion by imposing a nationwide injunction. 810 F.2d 104, 105 (6th Cir. 1987) (per curiam) ("*Here's Johnny II*").[15]  The facts of *Here's Johnny II* are distinguishable from the facts of this case.  In *Here's Johnny II*, the defendant challenged the imposition of a nationwide injunction, arguing that it be limited to the state of Michigan. *Ibid.* The court specifically noted the fact that "the defendant is uncertain, at this point, whether it wants to use the phrase 'Here's Johnny' in any state where the substantive law arguably differs from Michigan's." *Ibid.*  Therefore, the court concluded that "we see no harm in letting the injunction stand in its present form for the time being, at least." *Ibid.*  The court stated that "[i]f the defendant should hereafter decide that it wants to use the phrase in a state (other than Michigan) where it believes such use would be legal but for the

---

[15]In addition, in *Elvisly Yours*, 936 F.2d at 897, this court allowed a nationwide right of publicity injunction.  In that case, however, the defendant did not raise an objection to the nationwide scope of the injunction.

The district court did not err in recognizing a post-mortem right of publicity under Michigan common law.

## B. Nationwide Permanent Injunction as to Herman Miller's Right of Publicity Claim

### 1. *Standard of Review*

We review the district court's grant of a permanent injunction for an abuse of discretion. *See CSX Transp., Inc.*, 964 F.2d at 553.

### 2. *Analysis*

Palazzetti argues that the district court's decision granting a nationwide injunction as a remedy for Herman Miller's right of publicity claim improperly imposed Michigan common law on activities beyond the boundaries of the state. The crux of Palazzetti's argument is that the nationwide injunction is improper because New York, where Palazzetti is incorporated, and conducts its primary commercial activities, does not recognize a post-mortem right of publicity. *See, e.g., Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585-86 (2d Cir. 1990). As a result, Palazzetti argues that New York and all other states that do not recognize a post-mortem right of publicity should be excluded from the injunction.

The district court rejected this argument, noting that Palazzetti conducts business in interstate commerce out of its New York showroom and headquarters and has stores in states outside of New York. As a result, the district court stated that a nationwide injunction would be "appropriate in this case due to the inherent difficulty in policing an injunction that attempts to limit conduct in certain states, and not others."

The district court abused its discretion. Courts should exercise caution in extending the right of publicity to states that do not recognize that right:

Palazzetti cross-appeals the district court's denial of Palazzetti's motion for summary judgment on Herman Miller's right of publicity claim, as well as the geographic extent of the permanent injunction entered in favor of Herman Miller on the same claim.

For the following reasons, we affirm in part and reverse in part.

## I. Facts

### A. Herman Miller and the Eameses

Herman Miller has been manufacturing home and office furniture since 1905, originally as the Star Furniture Company and, after 1923, as the Herman Miller Furniture Company. From the mid-1940s until their deaths, Herman Miller had a business and personal relationship with noted California designer Charles Eames and his wife Ray Eames (and thereafter with the Eames estate). From 1961 to 1998, Herman Miller sold over $377 million of furniture designed by the Eameses.

In 1949, Herman Miller, Charles Eames, and the Evans Product Company signed an agreement giving Herman Miller all of Evans's rights to trademarks, trade names, trade secrets, and processes used in connection with Eames-designed furniture. From then on, Charles and Ray Eames designed furniture exclusively for Herman Miller. In 1990, Herman Miller signed an agreement with the Eames estate affirming that Herman Miller is the legal and equitable owner of rights to the EAMES[1] trademark, trade dress rights related to a lounge chair and ottoman designed by the Eameses, and rights

---

[1] The uppercase "EAMES" will be used to refer to the EAMES trademark. The lowercase "Eames" will be used to refer to Charles and Ray Eames.

of publicity in the names and likenesses of Charles and Ray Eames.

Charles and Ray Eames designed a number of pieces of furniture during their relationship with Herman Miller, including a chair known colloquially as the "potato chip chair" and a table known as the "surfboard table." In 1956, Charles and Ray Eames designed a lounge chair and ottoman of leather and wood. Herman Miller claims that this is "the most famous" of the pieces of furniture designed by the Eameses for Herman Miller. The frames of the chair and ottoman were fabricated of curved, molded sheets of rosewood plywood, and the upholstery was cushioned leather. The chair tilts and is mounted on a swivel base.

Herman Miller cites nine different aspects of the lounge chair and ottoman that it claims make the lounge chair and ottoman worthy of trade dress protection:

(1) Smooth curved, molded shells; the lounge chair having three shells, the ottoman, one.

(2) The molded shells being exposed from below the ottoman and from the back, sides, and underside of the chair.

(3) The edges of each molded shell being exposed from the front of the lounge chair and ottoman.

(4) Each of the molded shells being shaped like a flattened "U."

(5) Each molded shell with cushioned upholstery.

(6) Each molded shell having "buttons" that create permanent creases in the upholstery.

(7) The back of the lounge chair consisting of two molded shells, connected in the rear by two exposed bars,

available body of case law when deciding right of publicity cases." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622-23 (6th Cir. 2000) (internal citation omitted). One observer has stated that "[t]he overwhelming majority rule under either statute, or common law is that the right of publicity is descendible property and has an unconditional postmortem duration." MCCARTHY, *supra* n.2, at § 28:45. McCarthy notes that fourteen states have recognized a post-mortem right of publicity under statute or common law. *Ibid.*[12] In addition, two other states have recently enacted right of publicity statutes that recognize a post-mortem right of publicity.[13] Given the number of states that are agnostic as to the issue of a post-mortem right of publicity it may be something of an overstatement to state that sixteen states constitute an "overwhelming majority rule." However, it is true that, of the states that have addressed the issue of a post-mortem right of publicity by statute or caselaw, the majority have recognized the right.[14]

---

[12] Nine states explicitly recognize a post-mortem right of privacy by statute: California, Florida, Indiana, Kentucky, Nevada, Oklahoma, Tennessee, Texas, and Washington. Two states implicitly recognize a post-mortem right of publicity as part of a "privacy" statute: Nebraska and Virginia. Four states recognize a post-mortem right of publicity under common law: Georgia, New Jersey, Tennessee, and Utah. *See* MCCARTHY, *supra* n.2, at § 28:45. Tennessee recognizes both a statutory and common law right of publicity.

[13] These states are Illinois, *see* 765 ILL. COMP. STAT. § 1075/30, and Ohio, *see* OHIO REV. CODE ANN. § 2741.02.

[14] Our review of cases and statutes indicates only two states that have explicitly refused to recognize a post-mortem right of publicity: New York, *see Stephano v. News Group Publications*, *Inc.*, 474 N.E.2d 580, 584 (N.Y. 1984), and Wisconsin, *see* WIS. STAT. § 895.50(2)(b); *Hagen v. Dahmer*, No. CIV A. 94-C-0485, 1995 WL 822644, at *4 (E.D. Wis. Oct. 13, 1995) (unpublished opinion) (construing WIS. STAT. § 895.50(2)(b) to provide a right of publicity only for living persons).

rights, and therefore can extend beyond death. *See Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538, 1541 & n.2 (11th Cir. 1983) (recognizing right of publicity as a personal property right); *see also* KY. REV. STAT. ANN. § 391.170(1) ("a person has property rights in his name and likeness which are entitled to protection from commercial exploitation"); *State ex rel. Elvis*, 733 S.W.2d at 97 ("Unquestionably, a celebrity's right of publicity has value. It can be possessed and used. It can be assigned, and it can be the subject of a contract. Thus, there is ample basis for this Court to conclude that it is a species of intangible personal property."); MCCARTHY, *supra* n.2, at § 28:1 ("The right of publicity is property and is properly categorized as a form of intellectual property.").

The only *common law* decision not recognizing a post-mortem right to privacy is *Reeves*, in which the district court was influenced by an Ohio Supreme Court decision that rejected the concept of the right of publicity as a property right. *See Reeves*, 572 F. Supp. at 1235, *aff'd*, 765 F.2d at 80. We do not have similar law to guide us since Michigan courts have yet to address the right of publicity. Moreover, no jurisdiction other than Ohio has reached a similar conclusion. *See* MCCARTHY, *supra* n.2, at § 28.45 ("Ohio law stands as a lonely minority of one."). In addition, *Reeves* effectively has been overruled by statute since, in 1999, Ohio enacted a right of publicity statute that incorporates a post-mortem right of publicity. *See* OHIO REV. CODE ANN. § 2741.02. We believe that the weight of authority indicates that the right of publicity is more properly analyzed as a property right and, therefore, is descendible.

In reaching our decision, we are also influenced by the number of states that have recognized a post-mortem right of publicity. Indeed, "[a]s case law on [the] right [of publicity] is exceedingly rare . . . and because of the general constitutional policy of maintaining uniformity in intellectual property laws, courts typically give attention to the entire

each bar being angled to tilt the upper molded shell slightly forward of the lower molded shell.

(8) The angled bars spaced from the shells.

(9) Upholstered armrests that extend downwardly into the chair and that connect the two molded back shells to the molded seat shell.

Herman Miller presents numerous facts related to the lounge chair and ottoman in attempting to support its trade dress claim. It describes unsolicited media attention given to the lounge chair and ottoman when they were designed, including an interview by Arlene Francis of Charles and Ray Eames on NBC's *Today Show* on March 14, 1956, introducing the lounge chair and ottoman that Charles Eames stated he designed "for Herman Miller." Herman Miller notes that its Eames lounge chair and ottoman won the grand prize at the Milan Triennial, and that its Eames lounge chair and ottoman are on permanent exhibit at several museums.

Descriptions of the lounge chair and ottoman in various books and magazines are also presented during the course of over five hundreds pages of the record. Many of these descriptions specifically identify the Eames lounge chair and ottoman as manufactured by Herman Miller and a number of the publications refer to the relationship between Herman Miller and the Eameses. Herman Miller also cites the *Encyclopedia Americana*, noting that it shows a photo of a lounge chair and ottoman with the phrase "Herman Miller, Inc." below the photo. The encyclopedia entry states that Charles Eames "developed a series of chairs for the Herman Miller Company during the 1940s and 1950s" and that "[h]is most famous design was a soft leather-upholstered swivel tilt lounge chair and ottoman."

Herman Miller also presents affidavits of design experts, historians, authors, and employees of Herman Miller

recognizing Herman Miller as the only source for the lounge chair and ottoman. These affidavits attest to the unique nature and design of the lounge chair and ottoman and the fact that customers associate the Eames lounge chair and ottoman with Herman Miller. Herman Miller also offers evidence from various publications regarding owners of the Eames lounge chair and ottoman. In one interview, Indira Gandhi stated that she would sit in her "Eames chair," referring to her Herman Miller Eames lounge chair and ottoman (although she did not mention Herman Miller specifically). Other articles describe celebrities, such as Barbara Walters, who own Herman Miller Eames chairs and ottomans (some specifically mention Herman Miller and others do not). Furthermore, Herman Miller offers articles mentioning that producers of two television series, the highly rated *Frasier* and the less highly rated *It Takes Two*, acquired Herman Miller-manufactured Eames lounge chairs and ottomans to furnish the sets of their shows.

Finally, Herman Miller offers evidence of specific recognition of the distinctiveness of the lounge chair and ottoman. In 1970, the Herman Miller Eames lounge chair and ottoman were declared among the "One Hundred Greatest Products of All Time" by a group of designers. In 1995, the Corporate Design Foundation, a non-profit research and educational organization, included in the premiere issue of its *Journal of Business & Design* a silhouette of the lounge chair as one of sixteen distinctive corporate "shapes." The declaration was made in the context of a quiz in which readers were asked to match the shape with its identifying company. The correct match for the silhouette of the lounge chair was "Eames lounge chair." Explaining the absence of "Herman Miller" from the answer, the publisher of the quiz stated, "[i]n fact, the EAMES lounge chair and ottoman is so closely associated with Herman Miller, Inc., that the chair was referred to as the EAMES lounge chair. This symbol of Herman Miller was selected over the famous Herman Miller "M" design as an identifying corporate symbol." Also

name and personality." *Here's Johnny I*, 698 F.2d at 835 (quoting *Memphis Dev.*, 616 F. 2d at 957). The fact that the court used the words "during life" does not prevent us from concluding that the district court did not err in concluding that the right of publicity is descendible under Michigan law.[11]

Although the right of publicity is an outgrowth of the right of privacy, the two rights "protect fundamentally different interests and must be analyzed separately." *See Here's Johnny I*, 698 F.2d at 834. The right of privacy, which protects the right to an individual's self-esteem and dignity, typically ends at death. *See, e.g., Maritote v. Desilu Productions, Inc.*, 345 F.2d 418, 420 (7th Cir. 1965) (rejecting right of privacy claim brought under Illinois law by relatives of Al Capone and stating that "[i]t is anomalous to speak of the privacy of a deceased person"); *Lugosi v. Universal Pictures*, 603 P.2d 425, 430 (Cal. 1979) ("It is well settled that the right of privacy is purely a personal one; it cannot be asserted by anyone other than the person whose privacy has been invaded, that is, plaintiff must plead and prove that his privacy has been invaded."); RESTATEMENT (SECOND) OF TORTS § 6521 (1977) ("Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded.").

The right of publicity, however, is a right that protects the pecuniary right and interest in the commercial exploitation of a celebrity's identity. *See Here's Johnny I*, 698 F.2d at 834. These interests reflect property rights, as opposed to dignitary

---

[11] We note that although the *Here's Johnny I* court used the words "during life," the court was considering the rights of publicity of Johnny Carson, who was and is still living and was not specifically considering the question of whether a post-mortem right of publicity exists under Michigan law. In addition, the court was quoting from *Memphis Development*, a case interpreting Tennessee law that subsequently was rejected by the Tennessee courts.

Michigan should apply. Although the district court recognized that Michigan courts had not addressed either the right of publicity or the post-mortem right of publicity, the court concluded that Michigan courts would recognize such rights.

To support its claim, Palazzetti relies on precedent from this court interpreting the right of publicity under the law of other states in this Circuit. *See Memphis Dev. Found. v. Factors Etc., Inc.*, 616 F.2d 956, 957-59 (6th Cir. 1980) (right of publicity not devisable under Tennessee law); *Reeves v. United Artists*, 572 F. Supp. 1231, 1234-35 (N.D. Ohio 1983), *aff'd*, 765 F.2d 79, 80 (6th Cir. 1985) (per curiam) (relying on *Memphis Development* and Ohio right of privacy law in holding no post-mortem right of publicity under Ohio law). The holding of *Memphis Development* was subsequently undermined when the Tennessee Court of Appeals rejected its reasoning and declared that the right of publicity was descendible under Tennessee law. *See State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 97 (Tenn. Ct. App. 1987). This decision was acknowledged in *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, No. 85-5767, 1987 WL 37216, at *3 (6th Cir. Apr. 28, 1987) (unpublished table decision).

This court has speculated that Michigan courts would recognize the right of publicity. In *Here's Johnny I*, 698 F.2d at 834 n.1, this court acknowledged that Michigan courts had not addressed the right of publicity, but speculated that Michigan courts would recognize such a right since they had recognized a right of privacy. This court vacated the district court's decision to dismiss the plaintiff's right of publicity claim, stating "Michigan law . . . has not yet clearly addressed the right of publicity. But the general recognition of the right . . . suggests to us that the Michigan courts would adopt the right." *Ibid.* Quoting from *Memphis Development*, the court stated that "[t]he famous have an exclusive legal right during life to control and profit from the commercial use of their

included in the quiz were the CBS eye, the Coca-Cola bottle, the Apple computer apple, the McDonald's arches, the Travelers Insurance Co. umbrella, and Mickey Mouse as a symbol of the Disney Company.

## B. The Market for Eames Furniture

Herman Miller notes it has produced the Eames lounge chair and ottoman continuously since 1956 and has sold over 100,000 lounge chairs and ottomans. In addition, it points out that the lounge chair and ottoman have gained popularity as collectors' items and antiques and that a strong secondary market has come into existence for Eames lounge chairs and ottomans produced by Herman Miller. Herman Miller produces evidence demonstrating that buyers in this market specifically seek out Herman Miller Eames lounge chairs and ottomans.

In addition to this secondary collectors' market for chairs and ottomans produced by Herman Miller, there is evidence of a market for reproductions of the chair and ottoman manufactured and sold by numerous other companies. Herman Miller offers several media articles pointing out to modern furniture consumers the existence of this secondary market of "knockoffs" of the lounge chair and ottoman and stating that Herman Miller produces the original.

For over thirty years, Herman Miller has been aware of this market for reproductions of the chair and ottoman. James Christenson, the general counsel of Herman Miller, gave deposition testimony stating that since 1971, Herman Miller has learned of at least sixty-six different entities that were selling furniture patterned after the Eames lounge chair and ottoman. Herman Miller wrote at least seventy-seven letters to these entities. In none of the letters did Herman Miller request that the company cease production or marketing of the lounge chairs and ottomans. Herman Miller demanded only that the entities cease using the EAMES trademark in

marketing the reproductions. A recipient of one of the letters asked Herman Miller how it might subsequently sell its reproduction of the lounge chair and ottoman without infringing on the EAMES trademark. Herman Miller's intellectual property counsel responded: 'it is proper to refer to a chair designed by Charles Eames. Appropriate use of Mr. Eames' [sic] name would be as follows: "Patterned after a chair designed by Charles Eames."' In addition, there is evidence of letters sent by Herman Miller's counsel to at least three furniture manufacturers and one distributor that also were known to be selling reproductions of the Eames lounge chair and ottoman. In each case, Herman Miller asked that the entity not use the EAMES trademark.

### C.    Palazzetti and Its Business

Palazzetti is a New York corporation with its principal office in New York City and showrooms in New York, Long Island, Connecticut, Boston, Los Angeles, Dallas, and Washington. Palazzetti markets reproductions of modern classic furniture popularized between 1950 and 1980. In late 1989, Palazzetti started marketing a reproduction of the Eames-designed lounge chair and ottoman. The lounge chair and ottoman have been manufactured by several Italian companies, always with the requirement that the product be an exact replica of the original Eames design. Beginning in January 1990, Palazzetti advertised the lounge chair and ottoman in *The New York Times*. Palazzetti continued to advertise the lounge chair and ottoman in that publication periodically during the next five years.

### D.    Herman Miller's Knowledge of Palazzetti's Activities

As early as March 1990, Herman Miller became aware that Palazzetti was manufacturing furniture patterned after designs created by Charles and Ray Eames. Herman Miller discovered that Palazzetti was advertising a reproduction of the Eames-designed molded plywood chair, known as the

parlance, "Eames chair" could refer to either. Moreover, the testimony indicates that Palazzetti employees told customers in their showrooms that Palazzetti's products were reproductions. The only evidence that Herman Miller provides that indicates *possible* deception (let alone actual deception or a tendency to deceive) is the testimony of a Herman Miller employee at Herman Miller's Los Angeles showroom who was asked by a customer if Herman Miller's Eames lounge chair and ottoman was the same as one the customer had seen in Palazzetti's showroom. The district court properly granted judgment as a matter of law to Palazzetti as to this issue.

### IV.   Analysis: Palazzetti's Cross-Appeal

Palazzetti raises two issues on cross-appeal, both relating to Herman Miller's right of publicity claim. We will address each of these arguments in turn.

### A.    Recognition of a Post-Mortem Right of Publicity under Michigan Common Law

#### 1.   *Standard of Review*

This court reviews a district court's grant of summary judgment de novo, using the same standard employed by the district court. *See Daddy's Junky*, 109 F.3d at 280.

#### 2.   *Analysis*

Palazzetti contests the district court's decision recognizing a post-mortem right of publicity under Michigan common law. In its third motion for summary judgment, Palazzetti argued that Herman Miller's right of publicity claim should be dismissed because neither Michigan nor New York law recognizes a post-mortem right of publicity. The district court denied the motion, finding that the interests of Michigan (Herman Miller's home state) predominated over the interests of New York (Palazzetti's home state) and that the law of

(*i.e.*, evidence that individual consumers perceived the advertising in a way that misled them about the plaintiff's product)." *Ibid.* A plaintiff must present evidence that a "significant portion" of the consumer population was deceived. *Id.* at 616 (citation and internal quotations omitted). Although surveys are not required, "[s]uccessful plaintiffs usually [use surveys to] present evidence of the public's reaction." *Ibid.* (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994)). A plaintiff seeking *injunctive relief* for false advertising faces a lower standard of "showing only that the defendant's representations about its product have a tendency to deceive consumers." *Certified Podiatric Physicians*, 185 F.3d at 618 (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1551 (E.D. Pa. 1985)) (internal quotations omitted).

The district court properly granted judgment as a matter of law to Palazzetti as to Herman Miller's claims for damages and injunctive relief for false advertising. Herman Miller does not provide any consumer surveys to support its false advertising claims. Instead, it relies on two customer letters to Palazzetti referring to Palazzetti's lounge chair and ottoman as an "Eames chair and ottoman," or an "Eames chair," as well as testimony from Herman Miller and Palazzetti employees concerning representations made to customers who came to Palazzetti's showrooms, a trade show, and a Herman Miller showroom. This evidence falls far short of demonstrating that a "significant portion" of the consumer population was deceived by Palazzetti's advertising, which is necessary for damages. It also fails to meet the lower standard of showing a tendency to deceive, which is necessary for injunctive relief.

The letters simply make general reference to an "Eames chair and ottoman" and "Eames chair" and give no indication whether the consumers thought they had actually purchased original items rather than reproductions. In common

"potato chip chair." From March 23, 1990 through June 5, 1990, Herman Miller and Palazzetti corresponded regarding Palazzetti's manufacturing and marketing of the "potato chip chair."

In Herman Miller's first letter to Palazzetti, Herman Miller's counsel demanded that Palazzetti "immediately cease and desist all further use of the designation EAMES . . . in your advertising. We also demand that you immediately cease and desist from all further sale of the goods which simulate the EAMES . . . designs." After a response from Palazzetti indicating that it was making "fair use" of the name "Eames," Herman Miller responded with a letter stating that "it may be possible to resolve this dispute simply by having you indicate clearly in your literature that your products are in no way associated with Herman Miller, Inc. and are not the authorized or licensed versions of Charles Eames' [sic] designs."

Palazzetti's counsel responded to Herman Miller's second letter by stating that Palazzetti did not intend "to change its practices where it is not legally required to do so." Herman Miller then sent a third letter to Palazzetti requesting that Palazzetti indicate in its marketing material that the "product is in fact a reproduction, and not a product manufactured by the official licensee, Herman Miller, Inc." Palazzetti responded by a letter dated June 5, 1990, in which it continued to refuse to accede to Herman Miller's requests, and repeated that it was making fair use of the name "Eames."

Herman Miller did not respond to Palazzetti's final letter of June 5, 1990. Thinking that Herman Miller either abandoned its claims or recognized the validity of Palazzetti's position, Palazzetti continued to sell the lounge chair and ottoman and other Eames-designed furniture and to advertise the lounge chair and ottoman in *The New York Times*.

Herman Miller presents testimony that it had no knowledge of Palazzetti's advertising of its Eames-designed lounge chair and ottoman until 1994. When Herman Miller discovered Palazzetti's advertising of Eames-designed furniture in 1990, it only discovered advertising of the "potato chip chair." Palazzetti advertised its lounge chair and ottoman in *The New York Times* for four days in 1990, three days in 1991, none in 1992, fourteen days in 1993, and nineteen days by September 1994.

Herman Miller again wrote Palazzetti on September 29, 1994, demanding that Palazzetti cease use of the designation "C. Eames." Palazzetti declined to do so, but stated that it would make clear that it only used the Eames name to identify the original designer. Herman Miller did not respond to the letter and, in June 1995, filed its initial complaint in this case.

During discovery, Herman Miller found various reference to Eames in Palazzetti's advertisements, catalog, poster, price list, and invoices. Herman Miller also discovered customer letters referring to Palazzetti's furniture as an "Eames chair and ottoman" and as an "Eames chair." In addition, customers in Palazzetti's stores asked to purchase Palazzetti's "Eames" products.

Herman Miller refers to evidence that Palazzetti was aware that Herman Miller was using the EAMES trademark when Palazzetti began to manufacture and sell its reproductions. In addition, Herman Miller notes that none of Palazzetti's printed materials making reference to its Eames-designed furniture indicate that the furniture is a reproduction and that it was only when customers were in Palazzetti's showrooms that Palazzetti employees referred to the products as "reproductions."

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such acts.

15 U.S.C. § 1125(a)(1)(B).

To prove a claim for false advertising under the Lanham Act, a plaintiff must establish that: (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. *See Certified Podiatric Physicians*, 185 F.3d at 613.

Palazzetti's advertising, while not false, could be misleading in that it was "literally true, yet deceptive, or too ambiguous to support a finding of literal falsity." *Id.* at 614. Palazzetti had the right to make reproductions of Eames-designed furniture. Palazzetti did not state that it was marketing original pieces of Eames-designed furniture; rather, it failed to state clearly that it was offering reproductions of Eames-designed furniture. Palazzetti's advertising, therefore, while literally true, had the potential to be misleading, in that it could give customers the impression Palazzetti was offering original pieces of Eames-designed furniture produced by Herman Miller.

When a plaintiff makes a claim for *damages* under the Lanham Act based on deceptive or ambiguous advertising, the claim "can only be established by proof of actual deception

court concluded that Palazzetti suffered prejudice because of Herman Miller's delay since Palazzetti's potential liability for damages increased. Herman Miller offers no evidence indicating that Palazzetti was not prejudiced by Herman Miller's four-year delay in bringing suit to enforce its trade dress rights. Therefore, the district court properly granted summary judgment to Palazzetti as to this issue.

### D.  Judgment as a Matter of Law to Palazzetti as to Herman Miller's False Advertising Claim

#### 1.  Standard of Review

Judgment as a matter of law is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1). This court's review is de novo, applying the same standard used by the district court and viewing the evidence in the light most favorable to the nonmoving party. *See American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999).

#### 2.  Analysis

Herman Miller argues that the district court improperly granted judgment as a matter of law to Palazzetti as to Herman Miller's claims for damages and injunctive relief based on its allegations that Palazzetti engaged in false advertising. The Lanham Act is the statutory basis for a false advertising claim. It states:

(a) (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word . . . or false designation of origin, false or misleading description of fact, or false or misleading representations of fact, which–

. . .

### II.  Procedural History

#### A.   Herman Miller's Complaint

Herman Miller filed a complaint in the United States District Court for the Western District of Michigan on June 7, 1995. The complaint alleged that Palazzetti was violating Herman Miller's rights in the EAMES trademark and the Eames lounge chair and ottoman trade dress, and Herman Miller's rights of publicity in the names and likenesses of Charles Eames and Ray Eames. Specifically, Herman Miller alleged that Palazzetti was using the trademark, trade dress, and names and likenesses of the Eameses to sell imported copies of Herman Miller's Eames lounge chair and ottoman. Palazzetti objected to jurisdiction, contending that there was an insufficient nexus to sustain personal jurisdiction in federal district court in the Western District of Michigan. On December 27, 1995, Herman Miller voluntarily dismissed the action.

On June 25, 1996, based on the same factual allegations, Herman Miller filed the present action in the United States District Court for the Eastern District of Michigan. Herman Miller's claims were that: (1) Palazzetti's sale of the lounge chair and ottoman constituted trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and the common law of Michigan, and a false designation of origin under 15 U.S.C. § 1125(a); (2) Palazzetti engaged in false advertising under the Lanham Act and the common law of Michigan; (3) Palazzetti's actions constituted trade dress infringement under the Lanham Act; (4) Palazzetti was diluting Herman Miller's EAMES trademark and trade dress; and (5) Palazzetti's conduct violated Herman Miller's right of publicity in the "Eames" name under the laws of California and Michigan.

## B.   Summary Judgment to Palazzetti as to Laches, but not as to Estoppel

On March 5, 1997, Palazzetti filed a motion for summary judgment on the issues of laches and estoppel, urging the court to deny Herman Miller any monetary recovery.  On February 5, 1998, the district court entered an order granting the motion in part and denying it in part.   The court ruled that: (1) Herman Miller knew of Palazzetti's use of the name "Eames" in connection with furniture as early as March 1990; (2) furniture sold by Palazzetti in 1990 was the same furniture covered by the lawsuit; (3) it did not matter whether Palazzetti knew in 1990 of each and every particular piece of furniture sold by Palazzetti that may become subject to the lawsuit;  and (4) the period of delay in bringing suit began in 1990.   As a result, the court held that a rebuttable presumption of laches was created by Herman Miller's failure to bring suit until 1995.  The court determined that Herman Miller could not rebut the presumption of laches.  The court ruled that laches barred Herman Miller from recovering damages for *past* trademark and trade dress infringement.  The court also ruled, however, that the delay did not estop Herman Miller from *future* injunctive relief or *post-suit* monetary relief.

## C.   Summary Judgment to Palazzetti as to Trade Dress

On April 7, 1997, Palazzetti filed a second motion for summary judgment on Herman Miller's trade dress infringement and dilution claims, arguing that Herman Miller had abandoned any rights that it might have had in the trade dress of the lounge chair and ottoman.  Palazzetti's motion was based on the argument that, for forty years, Herman Miller had permitted many companies to manufacture or sell lounge chairs and ottomans in the style originally designed by Charles and Ray Eames.  Palazzetti argued that Herman Miller only asked the companies not to use the name

undertaken by Herman Miller would have discovered that Palazzetti was producing the lounge chair and ottoman.  Herman Miller hides behind a misstatement by Palazzetti in its brief supporting its summary judgment motion on the issue of laches, in which Palazzetti stated that it advertised the lounge chair and ottoman in *The New York Times* "*on a monthly basis* for the next five (5) years" after 1990 (emphasis added).   The record indicates that Palazzetti advertised the lounge chair and ottoman in *The New York Times* only *four times* in 1990, *three times* in 1991, *zero times* in 1992, *fourteen times* in 1993, and *nineteen times* by September 1994, when Herman Miller claims it first became aware of Palazzetti's advertising of the Eames-designed lounge chair and ottoman.

Even though Palazzetti did not advertise the lounge chair and ottoman on a regular basis, this is no excuse for Herman Miller's lack of diligence.  The facts in the record indicate that Palazzetti *did* advertise the lounge chair and ottoman in a major newspaper in the early 1990s, at the time and after the time that Herman Miller became aware that Palazzetti was already reproducing the Eames-designed "potato chip chair." Moreover, even without the advertising, the fact that Herman Miller was aware that Palazzetti was reproducing *some* Eames-designed furniture put Herman Miller on notice to conduct further investigation, such as obtaining Palazzetti's product catalogs or visiting its New York showroom. Either action would have revealed to Herman Miller that Palazzetti was reproducing and selling the Eames-designed lounge chair and ottoman in 1990.  Given that Herman Miller was on notice of Palazzetti's marketing of reproductions of Eames-designed furniture in 1990, its lack of diligence in not discovering that Palazzetti was reproducing the lounge chair and ottoman until 1994 is inexcusable.

Herman Miller also asserts that, even if it lacked diligence in bringing suit, the issue of whether Palazzetti was prejudiced is a genuine issue of material fact.  The district

file suit until 1994. Herman Miller claims that the district court erred in two respects: first, by finding that the analogous statute of limitations had run, and second, by ultimately finding in favor of Palazzetti as to laches.

The district court did not err. Herman Miller is unable to demonstrate either that the analogous statute of limitations had not run or that there is a genuine issue of material fact as to (1) whether it was diligent in asserting its rights against Palazzetti or (2) whether Palazzetti was prejudiced. The statute of limitations issue and the first part of the laches inquiry can be analyzed together. Herman Miller allowed the statute of limitations to lapse by its lack of diligence in pursuing its trade dress rights in the lounge chair and ottoman. In 1990, Herman Miller knew that Palazzetti was reproducing Eames-designed furniture and referring to the name "Eames." Herman Miller admits that in 1990 it became aware that Palazzetti was selling reproductions of the Eames-designed "potato chip chair." In addition, Herman Miller engaged in correspondence with Palazzetti in 1990 regarding its marketing of reproductions of Eames-designed furniture. Herman Miller argues, however, that this was an improper basis for the district court to apply laches since it was not until *1994* that Herman Miller *specifically* became aware of Palazzetti's reproduction of the *lounge chair and ottoman*.

This argument is unavailing. There is sufficient evidence in the record to indicate that once Herman Miller became aware that Palazzetti was reproducing Eames-designed furniture in 1990, it should have been aware or should have become aware of the fact that Palazzetti was also reproducing the lounge chair and ottoman at that time. *See Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000) ("delay attributable to the plaintiff must be measured from the time at which the plaintiff knew *or should have known* that [defendant's] infringement had ripened into a provable claim") (emphasis added). Herman Miller takes issue with the district court's conclusion that "any" investigation

"Eames," but did not stop their production or sale of the lounge chairs and ottomans.

The district court granted Palazzetti's motion. The court did *not* base its decision on the issue of abandonment, however. Instead, the court ruled that it need not reach the issue of abandonment since Herman Miller presented insufficient evidence to demonstrate that the lounge chair and ottoman were entitled to trade dress protection under the Lanham Act. Dismissal of Herman Miller's trade dress infringement claim resulted in dismissal of Herman Miller's trade dress dilution claim *sub silentio*.

### D. Denial of Palazzetti's Motion for Summary Judgment as to Right of Publicity

On June 25, 1997, Palazzetti filed a third motion for summary judgment. Palazzetti sought dismissal of Herman Miller's claims with respect to its rights of publicity in the names and likenesses of Charles and Ray Eames under California and Michigan law. Palazzetti argued that neither Michigan nor New York (Palazzetti's home state) recognized a post-mortem right of publicity. On February 5, 1998, the court denied Palazzetti's motion. The court found that Michigan law applied to the claim even though Michigan courts had yet to address either the existence of a right of publicity or whether a post-mortem right of publicity exists under Michigan law. The district court concluded that a post-mortem right of publicity exists under Michigan common law.

### E. The Trial and its Aftermath

In late September and early October, 1998, a jury trial was held as to the remaining issues. On October 5, at the close of Herman Miller's evidence, Palazzetti moved for judgment as a matter of law on Herman Miller's false advertising claim. The motion was granted from the bench.

On October 5, 1998, the jury returned a verdict against Palazzetti on the issue of liability as to the remaining claims, finding that: (1) Palazzetti had infringed Herman Miller's EAMES trademark; (2) Palazzetti had diluted Herman Miller's EAMES trademark; (3) Palazzetti had engaged in unfair competition; and (4) Palazzetti had violated Herman Miller's right of publicity in the names and likenesses of Charles Eames and Ray Eames.

On October 16, 1998, the district court issued a permanent injunction enjoining Palazzetti from: (1) using "Eames," "C. Eames," "Charles Eames," or "Ray Eames" as a trademark; (2) acts causing dilution of the EAMES trademark; and (3) using the names and likenesses of Charles or Ray Eames in connection with Palazzetti's furniture. The injunction applied nationwide. The permanent injunction permitted Palazzetti to "fairly identify" Charles and Ray Eames as the original designers of furniture after which Palazzetti patterned or reproduced its own furniture.

On October 26, 1998, the district court approved a stipulated partial judgment: (1) awarding Herman Miller post-filing damages of $72,500 for the trademark infringement, trademark dilution, unfair competition, and right of publicity claims; (2) allowing Palazzetti to seek appellate review of the verdict; and (3) allowing Herman Miller to seek appellate review of the grant of summary judgment on the trade dress issue and additional damages on account of trade dress infringement.

On December 1, 1998, the court entered a final judgment in this case consistent with its earlier rulings and the jury verdict. Both Herman Miller and Palazzetti filed timely appeals.

district court. *See Daddy's Junky*, 109 F.3d at 280. When the record before the district court on a motion for summary judgment shows factual issues in dispute that could affect the equity of the application of laches to bar the claim, the district court must deny the motion and permit the parties to present their proof. *See Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.,* 630 F.2d 1155, 1164 (6th Cir. 1980).

### 2. Analysis

The district court granted Palazzetti summary judgment as to laches with respect to all of Herman Miller's claims. This finding barred Herman Miller from obtaining pre-suit monetary damages related to these claims. Herman Miller only appeals the district court's finding of laches as to its trade dress claims.

Laches is the "negligent and unintentional failure to protect one's rights." *Elvisly Yours*, 936 F.2d at 894. A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it. *See Induct-O-Matic Corp. v. Inductothem Corp.*, 747 F.2d 358, 367 (6th Cir. 1984). There is a strong presumption that a plaintiff's delay in bring suit for monetary relief is not unreasonable as long as the analogous statute of limitations has not lapsed. *See Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365-66 (6th Cir. 1985). "Only rarely should laches bar a case before the analogous statute has run." *Id.* at 366. The statute of limitations in a trademark case is that for injury to personal property. *See Sprinklets Water Center, Inc. v. McKesson Corp.*, 806 F. Supp. 656, 663 (E.D. Mich. 1992). Under Michigan law, the period is three years. *See ibid.*

The district court concluded that Herman Miller waited four years to enforce its trade dress rights in the Eames lounge chair and ottoman since it was on notice that Palazzetti was reproducing Eames-designed furniture in 1990 and did not

Palazzetti is not allowed to exploit the identity of the Eameses commercially, but at the same time it can accurately identify the reproductions that it is entitled to produce. The district court's remedy prevents "harmful or excessive commercial use" of the identity of the Eameses by limiting Palazzetti's ability to refer to the names and likenesses of Charles and Ray Eames. At the same time it "affords protection against false suggestions of endorsement of sponsorship," because it enables Palazzetti to state that its furniture is based on the Eameses's designs and, therefore, is not an original piece of furniture designed by the Eameses.[10]

In order to overturn an injunction for an abuse of discretion we must be left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1276 (6th Cir. 1998) (citation and internal quotations omitted). We are not left with such a conviction in this case. Therefore, we uphold the scope of the district court's injunction.

**C.  Summary Judgment to Palazzetti on Laches as to Herman Miller's Trade Dress Claims**

**1.  *Standard of Review***

This court reviews a district court's grant of summary judgment de novo, using the same standard employed by the

---

[10] In this sense, giving Palazzetti the right to "fairly identify" its furniture as originally designed by the Eameses may actually be to Herman Miller's benefit. As we understand Herman Miller's position, we should amend the district court's injunction so that Palazzetti could not mention the name "Eames" at all. For customers who can recognize furniture the Eameses produced, but not the fact that Herman Miller produces the original version of this furniture, not allowing Palazzetti to use the name "Eames" at all may give the impression that Palazzetti is selling "original" Eames furniture since Palazzetti would not be able to "fairly identify" the Eameses as the original designers "of the furniture after which Palazzetti patterned or reproduced its own furniture."

**III.  Analysis: Herman Miller's Appeal**

Herman Miller raises four issues in its appeal of the district court proceedings. We will address each of these four arguments in turn.

**A.  Summary Judgment to Palazzetti as to Herman Miller's Trade Dress Claims**

**1.  *Standard of Review***

This court reviews a district court's grant of summary judgment de novo, using the same standard employed by the district court. *See Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *See National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

**2.  *Analysis***

**a.  *Trade Dress Background and the Effect of* Samara Brothers**

Herman Miller brings its trade dress claims under section 43(a) of the Lanham Act, which prohibits any person from using "any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . .  of his or her goods . . . ." 15 U.S.C.

§ 1125(a)(1)(A).[2]  Trade dress refers to "the image and overall appearance of a product." *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir. 1989). It "embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale." *Ferrari S.P.A. Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (citation and internal quotations omitted).

To prove a claim of trade dress infringement under § 43(a) of the Lanham Act, Herman Miller must establish, by a preponderance of the evidence:  (1) that its trade dress in the Eames lounge chair and ottoman is protectable; (2) that there is a likelihood of confusion between Herman Miller's lounge chair and ottoman and that of Palazzetti; and (3) that the appropriated features of the lounge chair and ottoman are primarily nonfunctional. *See ibid.*  The district court granted summary judgment to Palazzetti on the basis that Herman Miller's trade dress in the Eames lounge chair and ottoman is not protectable.[3]

---

[2] Trade dress issues follow the same rules and laws as trademark issues. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992) (Stevens, J., concurring) ("[T]he Court interprets [§ 43(a)] as having created a federal cause of action for infringement of unregistered trademark or trade dress and concludes that such a mark or trade dress should receive essentially the same protection as those that are registered."); *see also* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 27:18 (4th ed. 1996) ("The clear message of the *Taco Cabana* case is that the general rules of trademark validity and infringement are to be applied to infringement claims brought under Lanham Act § 43(a).").

[3] The parties have not litigated the other two necessary components of a Lanham Act violation before the district court. Therefore we will not address them on appeal.

enlighten the trade regarding the (supposed) virtues of the reproduction." *Hypertherm*, 832 F.2d at 701.

Pursuant to the district court's injunction, Palazzetti cannot use the EAMES trademark, meaning it cannot use the word "Eames" in the secondary meaning created by the trademark. However, trademark law indicates that in the interests of free competition, Palazzetti can use the word "Eames" in its original, descriptive, and primary sense.  In light of the right of publicity decision against Palazzetti, however, Palazzetti's trademark fair use rights in the word "Eames" were, in effect, significantly reduced, since Palazzetti lost the rights to use the names or likenesses of Charles and Ray Eames in connection with its reproductions of furniture originally designed by the Eameses.  This is because under the right of publicity "a celebrity has a protected pecuniary interest in the commercial exploitation of his identity."  *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 835 (6th Cir. 1983) ("*Here's Johnny I*").  Therefore,

> [t]he right to prohibit unauthorized commercial exploitation of one's identity allows a person to prevent harmful or excessive commercial use that may dilute the value of the identity. Although proof of deception or confusion is not an element of liability under this Section, the right of publicity indirectly affords protection against false suggestions of endorsement or sponsorship.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 46 cmt. c (1995).

The district court limited Palazzetti's rights appropriately in light of the purposes of the right of publicity by preventing Palazzetti from using the names and likenesses of the Eameses in any circumstance *except* for the limited ability of Palazzetti to identify accurately its furniture as based on original designs of Charles and Ray Eames.  As a result,

furniture originally designed by the Eameses.[9]  Although Herman Miller objects to Palazzetti's reproductions of these other pieces of furniture, Herman Miller has not asserted trade dress rights in these designs.  Recognizing this fact, the district court allowed Palazzetti a limited ability to accurately identify *these* pieces of furniture as having been originally designed by Charles and Ray Eames.

The district court also was forced to balance Palazzetti's fair use rights in trademark with Herman Miller's rights of publicity in the names and likenesses of the Eameses.  Under the doctrine of "fair use," the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense.

> The only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, "trademark" meaning of the word that plaintiff has created.  The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition.

MCCARTHY, *supra* n.2, at § 11:45.  Courts have recognized that a defendant found liable for trademark violations still retains a right "to identify the product it has copied, so long as no misrepresentation is made and no confusion is generated as to the source, sponsorship, or identify of the eratsz goods." *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987); *see also Pebble Beach Co. v. Tour 18 I Limited*, 155 F.3d 526, 545 (5th Cir. 1998).  Therefore "[a]s long as an imitation is marketed as such, its votarists may refer descriptively to the original (copied) product to

---

[9] Of course, if Herman Miller is unable to prevail on its trade dress claim, Palazzetti can continue to produce the lounge chair and ottoman as well.

Since the district court issued its decision in this case, the protectability analysis in a trade dress claim based on product design has changed considerably.  At the time of the district court's decision, trade dress was protectable if it was proven either to be inherently distinctive or to have acquired distinctiveness through secondary meaning.  *See Two Pesos*, 505 U.S. at 776.  The district court determined that Herman Miller's Eames lounge chair and ottoman neither were inherently distinctive nor had acquired secondary meaning.  Therefore, the court granted summary judgment to Palazzetti on Herman Miller's trade dress claim.

In *Wal-Mart Stores, Inc. v. Samara Brothers*, 529 U.S. 205, 216 (2000), the Supreme Court held that "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's *design* is distinctive, and therefore protectable, *only* upon a showing of secondary meaning." (emphases added).  This decision resolved a circuit split in which the circuits differed as to which law to apply to determine whether trade dress was inherently distinctive.  Some courts applied different tests depending on whether the trade dress was for the package containing the product or for the product itself.  Part of this confusion was a result of the fact that it was only in 1992 that the Supreme Court held that trade dress, like a trademark, could be inherently distinctive. *See Two Pesos*, 505 U.S. at 773.

In *Samara Brothers*, the Supreme Court noted several reasons why the inherently distinctive test should not be applied in trade dress cases based on product design.  The Court noted the fact that product design "almost invariably serves purposes other than source identification," such as making products more useful or appealing.  529 U.S. at 213.  The Court also stated that application of the inherently distinctive test in product design cases could deprive consumers of "the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves . . . ."  *Ibid.*

The Court then differentiated *Samara Brothers* from *Two Pesos*. *Samara Brothers* concerned a claim brought by a children's clothing designer and manufacturer alleging that Wal-Mart was selling "knockoff" copies of the designer's clothes, namely "a line of spring/summer one-piece seersucker outfits decorated with appliques of hearts, flowers, fruits, and the like." 529 U.S. at 207, 208. In *Two Pesos*, the Court held that the trade dress of a chain of Mexican restaurants, which the plaintiff described as "a festive eating atmosphere having interior dining and patio areas decorated with antiques, bright colors, paintings and murals," *id.* at 214-15 (quoting *Two Pesos*, 505 U.S. at 765), could be protected under § 43(a) without a showing of secondary meaning. *Samara Bros.*, 529 U.S. at 215 (citing *Two Pesos*, 505 U.S. at 776). The *Samara Brothers* Court differentiated *Two Pesos* on the basis that the "trade dress at issue, the decor of a restaurant, seems to us not to constitute product design." *Samara Bros.*, 529 U.S. at 215. The Court stated that it was either "product packaging—which, . . . normally *is* taken by the consumer to indicate origin" or "some *tertium quid* that is akin to product packaging and has no bearing on the present case." *Ibid*.

After *Samara Brothers*, trade dress claims based on product packaging can be proven upon a showing of either inherent distinctiveness or secondary meaning, but trade dress claims based on product design can be proven only upon a showing of secondary meaning. The Court noted that this distinction could produce some hard cases "at the margin." *Ibid.* The Court cited one example:

> a classic glass Coca-Cola bottle, for instance, may constitute packaging for those customers who drink the Coke and then discard the bottle, but may constitute the product itself for those consumers who are bottle collectors, or part of the product itself for those consumers who buy Coke in the classic glass bottle,

prohibiting the defendant from using the plaintiff's trademark and publicity rights "for any purpose whatsoever." *Ibid.* We concluded that the prohibition:

> is too broad insofar as it covers more than the unauthorized commercial use or exploitation of [the plaintiff's] rights. There are various activities that [the defendant] could engage in that would not violate [the plaintiff's] legitimate trademark and publicity rights, such as writing a magazine article or book about Elvis Presley or dealing in properly licensed products. The injunction should be limited so as to prohibit [the defendant's] unauthorized use of the publicity rights or trademarks of [the plaintiff] for commercial purposes.

*Ibid.* The Court in *Elvisly Yours* recognized that a right of publicity injunction cannot prevent a defendant from making reference to a person's name or likeness in all circumstances, but only in cases of "unauthorized commercial use or exploitation of [the plaintiff's] rights." *Ibid.*; *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 48 cmt c. (1995) ("Because of the limited scope of the right of publicity, an injunction will ordinarily prohibit only unauthorized use of the plaintiff's identity in advertising or merchandising activities."). Therefore, a permanent injunction relating to a right of publicity claim must be limited in scope to those activities that the right protects.

The district court in this case was faced with the challenge of balancing several competing legal interests. For one, the district court was forced to balance Herman Miller's right of publicity in the names and likenesses of the Eameses with Palazzetti's right to reproduce furniture originally designed by the Eameses. Even if Herman Miller were to prevail on its trade dress claim related to the lounge chair and ottoman, Palazzetti would still have a right to produce reproductions of the "potato chip chair," the "surfboard table," and other

### 2. Analysis

Herman Miller argues that it was improper for the district court to create a "fair use" exception in its October 16, 1998 permanent injunction, issued pursuant to the jury verdict in favor of Herman Miller on its trademark, unfair competition, and right of publicity claims. Specifically, Herman Miller takes issue with paragraph 4 of the injunction, which allows Palazzetti to "fairly identify Charles Eames and/or Ray Eames as the original designers of the furniture after which Palazzetti patterned or reproduced its own furniture."

The injunction forbids Palazzetti from: (1) using the names "Charles Eames," "C. Eames," "Ray Eames," and/or "Eames" as a trademark for furniture; (2) causing dilution of the distinctive quality of the EAMES trademark; and (3) using the names or likenesses of Charles Eames or Ray Eames in connection with the sale of furniture. The first two portions of the injunction relate to Herman Miller's trademark claim, while the third portion relates to Herman Miller's right of publicity claim. Herman Miller asserts that Palazzetti may be able to "fairly identify" the Eameses as the original designers of its furniture under the "fair use" exception to the *trademark* portion of the injunction. However, Herman Miller claims that Palazzetti *cannot* be allowed to "fairly identify" the Eameses under the *right of publicity* portion of the injunction since that portion of the injunction forbids Palazzetti from using the "names or likenesses of Charles Eames and Ray Eames in connection with the sale of furniture." Therefore, Herman Miller claims that the district court erred in allowing Palazzetti to "fairly identify" the Eameses.

Herman Miller does not persuade us that the district court abused its discretion. In *Elvis Presley Enterprises, Inc. v. Elvisly Yours Inc.*, 936 F.2d 889, 897 (6th Cir. 1991), this court reviewed an injunction issued in favor of a plaintiff that prevailed on its trademark and right of publicity claims. This court held that the district court abused its discretion by

rather than a can, because they think it more stylish to drink from the former.

*Ibid*. To the extent that difficult cases exist, the Court stated that "courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Ibid*.

This is not a hard case, however. Herman Miller's trade dress claims regarding the Eames lounge chair and ottoman are based on product design and cannot be confused with product packaging. Therefore, on appeal we must analyze Herman Miller's trade dress claims *solely* to determine if Herman Miller can demonstrate that its Eames lounge chair and ottoman have acquired sufficient *secondary meaning* in the marketplace that they have become associated in the public's mind with Herman Miller. The district court's *inherently distinctive* analysis is no longer relevant to this case in light of the Supreme Court's holding in *Samara Brothers*.

### b. Protectable Trade Dress and Abandonment

Before analyzing whether Herman Miller's Eames lounge chair and ottoman have become protectable trade dress by acquiring secondary meaning, we must note the procedural posture of Herman Miller's trade dress claims. Palazzetti's summary judgment motion as to Herman Miller's trade dress claims was based on the argument that Herman Miller had *abandoned* any trade dress rights it *may* have had in the Eames lounge chair and ottoman. It was only in Herman Miller's response brief that Herman Miller raised the issues of inherent distinctiveness and secondary meaning related to the protectability of its trade dress. Palazzetti responded to these issues in its reply brief.

Herman Miller raised the issue of the protectability of its trade dress to the district court as a defense against

Palazzetti's claim of abandonment. In its brief to the district court, Herman Miller noted that abandonment occurs "[o]nly when all rights of protection are extinguished." *Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 765 (C.C.P.A. 1982). Herman Miller used the inherently distinctive and secondary meaning inquiries related to protectable trade dress as a means of arguing to the district court that its lounge chair and ottoman have retained their "strength as an indicator of source" and, therefore, have not been abandoned. Herman Miller appears to have been conflating the protectable trade dress inquiry and the abandonment inquiry. They are separate and distinct. According to Section 45 of the Lanham Act, trade dress may be abandoned:

> when any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

15 U.S.C. § 1127. Therefore, the fact that trade dress may be *protectable* by acquiring secondary meaning does not mean it is automatically *protected* since the owner's trade dress rights might have been abandoned through actions of the owner that caused the trade dress to become generic or lose its significance as a mark.

The district court ruled in favor of Palazzetti on the basis that Herman Miller had not presented sufficient factual evidence demonstrating that the Eames lounge chair and ottoman were either inherently distinctive or had acquired secondary meaning. In other words, the district court concluded that there was no genuine issue of material fact that the lounge chair and ottoman were protectable trade dress. Since the court concluded that the lounge chair and ottoman were not protectable trade dress, the court did not address the

*Fifth Ave., Inc.*, 219 F.3d 104, 110 (2d Cir. 2000) (rejecting abandonment claim on basis that "the evidence below suggests that [plaintiff's] designs continue to indicate their source, and that [plaintiff] vigorously pursued manufacturers of knockoff goods in an effort to protect its mark"); *Sweetheart Plastics, Inc. v. Detroit Foaming, Inc.*, 743 F.2d 1039, 1048 (4th Cir. 1984) ("Evidence of a trademark owner's failure to prosecute infringers is relevant to a determination of the defense of abandonment only where such failure amounts to the mark's losing significance as an indication of source.").

To summarize, we reverse the district court's decision granting summary judgment to Palazzetti as to Herman Miller's trade dress claims. Herman Miller's trade dress infringement and dilution claims are revived. We remand these claims to the district court with instructions that (1) the issue of protectability is preserved for trial, and (2) the district court must address Palazzetti's affirmative defense of abandonment.

**B. Permanent Injunction Enabling Palazzetti to "Fairly Identify" the Eameses**

*1. Standard of Review*

This court reviews a district court's grant of a permanent injunction for an abuse of discretion. *See CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548, 553 (6th Cir. 1992). A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law. *See Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985). An abuse of discretion is defined as a definite and firm conviction that the district court committed a clear error of judgment. *See Pouillon v. City of Owosso*, 206 F.3d 711, 714 (6th Cir. 2000).

*See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996). One noted observer has stated that:

> it appears that the only relevance of failure to prosecute others is as to the possible impact such failure may have on the strength of the plaintiff's mark. It is possible that the plaintiff's mark has been 'weakened' by widespread use in the market and that such use resulted from plaintiff's failure to sue infringers. That is, the only way to prevent a market from becoming 'crowded' with similar marks is a program of aggressive enforcement.

MCCARTHY, *supra* n.2, at § 17:17.

At the same time, the observer has stated that "if, through failure to prosecute, a mark continually loses 'strength' and 'distinctiveness,' it will eventually hemorrhage so much that it dies as a mark. That would be 'abandonment' through acts of omission." *Ibid.* However, the observer goes on to state that, "[t]he issue is hardly ever 'abandonment,' because that requires proof that the mark has lost all significance as an indication of origin." *Ibid.* Although it appears unlikely that failure to prosecute, by itself, can establish that trade dress has been abandoned, it is possible that, in extreme circumstances, failure to prosecute may cause trade dress rights to be extinguished by causing a mark to lose its significance as an indication of source. *See Hermes Int'l v. Lederer de Paris*

---

is an issue of validity for non-inherently distinctive designations, 'strength' is an enquiry into a factor leading to the determination of infringement of any kind of mark. The common denominator is the nature of the evidence used to support both legal concepts.

MCCARTHY, *supra* n.2, at § 11.82.

issue of abandonment, since there was no trade dress that Herman Miller could have abandoned.

Our task on appeal is to determine if the district court erred in concluding that Herman Miller had presented insufficient factual evidence to demonstrate that its trade dress in the lounge chair and ottoman is protectable. As we will explain, Herman Miller has presented sufficient factual evidence to raise a genuine issue of material fact as to the protectability of its trade dress. Therefore, it has preserved this issue for trial. However, the fact that Herman Miller has raised a genuine issue of material fact as to whether its Eames lounge chair and ottoman trade dress is protectable, does *not* dispose of the issue of abandonment, which we will remand to the district court for further consideration, as the district court did not consider this issue in its summary judgment decision.

### c.　Have the Lounge Chair and Ottoman Acquired Secondary Meaning?

In contrast to the inherently distinctive test, the secondary meaning test focuses on *acquired* distinctiveness. Secondary meaning has been defined as follows:

> To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

*Ferrari*, 944 F.2d at 1239, quoting *West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 595 (6th Cir. 1955). Herman Miller must demonstrate that its Eames lounge chair and ottoman have become identified with Herman Miller in the minds of the potential customer.

The district court applied a six-factor test devised by the Second Circuit in analyzing the issue of secondary meaning. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987). Since the district court's decision, this court has adopted a similar, but slightly broader, seven-factor test. *See Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 1999), *rev'd on other grounds sub nom. TrafFix Devices v. Marketing Displays, Inc.*, 121 S. Ct. 1255 (2001) (adopting test articulated in *Sassafras Enters., Inc. v. Roschco, Inc.*, 915 F. Supp. 1, 7 (N.D. Ill. 1996)).[4]

In considering this case on appeal we must apply the *TrafFix* factors that this court has adopted to analyze secondary meaning in a trade dress case. The factors are:

1. direct consumer testimony;
2. consumer surveys;
3. exclusivity, length, and manner of use;
4. amount and manner of advertising;
5. amount of sales and number of customers;
6. established place in the market; and
7. proof of intentional copying.

*TrafFix*, 200 F.3d at 937. No single factor is determinative and every one need not be proven. *See Centaur*, 830 F.2d at 1222.

---

[4] *TrafFix* involved a plaintiff who was attempting to obtain trade dress protection for the WindMaster traffic sign stand, a dual-spring design mechanism used to hold up temporary road signs against strong gusts of wind. This court reversed the district court's grant of summary judgment in favor of the defendant on the grounds that the district court improperly ruled that there was no genuine issue of material fact as to secondary meaning and that the trade dress was a functional product configuration. *TrafFix*, 200 F.3d at 937-40. The Supreme Court reversed on the basis that the trade dress was functional. *TrafFix*, 121 S. Ct. at 1261-62.

Lanham Act violation for trade dress infringement – likelihood of confusion and non-functionality – issues that neither party raised at summary judgment. In addition, Herman Miller's trade dress dilution claim is revived. Finally, the district court must still address the original basis for Palazzetti's summary judgment motion as to Herman Miller's trade dress claims: Palazzetti's defense that Herman Miller has abandoned whatever trade dress rights it had in the Eames lounge chair and ottoman.

In supporting its abandonment claim, Palazzetti relies on facts indicating that Herman Miller failed to prosecute infringers of its trade dress rights in the Eames lounge chair and ottoman. We note that this evidence is relevant to determining both (1) the strength of Herman Miller's trade dress for purposes of establishing likelihood of confusion and (2) whether Herman Miller has abandoned its trade dress rights in the lounge chair and ottoman.

One of the necessary factors to analyze in determining likelihood of confusion is the strength of the plaintiff's mark.[8]

---

[8] While the evidence examined is similar, the determination of "secondary meaning" for ascertaining if the trade dress has become protectable through acquired distinctiveness *differs* from the determination of the strength of the trade dress for ascertaining likelihood of confusion:

When determining the commercial or marketplace strength of a mark, the courts look to the same kind of evidence of real world recognition of the mark as is used to decide the presence or absence of secondary meaning to determine whether a non-inherently distinctive designation is or is not a valid mark. Because the evidence is of the same nature, some courts occasionally misapply the legal label "secondary meaning" to denote the kind of marketplace recognition evidence needed to determine the degree of strength for a mark. This can lead to disorientation for both judges and attorneys. The distinction between the legal concepts of 'secondary meaning' and 'strength' is both real and critical. While 'secondary meaning'

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir. 1988) (preliminary injunction for plaintiff upheld based on its half-century use of name, advertising, substantial free publicity, and wide-ranging activities in support of dog groups); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir. 1986) (preliminary injunction for plaintiff upheld based on its use of words "chocolate fudge" in connection with chocolate-flavored soft drink for thirteen years, nationwide publicity, and numerous letters and phone calls "all searching for the elusive diet chocolate fudge drink.").

The district court rejected Herman Miller's trade dress claim principally on the grounds that there was no evidence "that the general public attributes the lounge chair and ottoman to [Herman Miller]." There is sufficient evidence indicating the Herman Miller established a connection between itself and the Eames lounge chair and ottoman in "a small but very well-defined group of people" that form the consuming public in modern furniture. *Int'l Kennel Club*, 846 F.2d at 1086. As a result, the district court erred in granting Palazzetti summary judgment on Herman Miller's trade dress claims on the basis that Herman Miller could not establish the protectability of its trade dress.

### d. Conclusion

There is a genuine issue of material fact as to whether Herman Miller's trade dress in the Eames lounge chair and ottoman has acquired secondary meaning. Therefore, the issue of the protectability of Herman Miller's trade dress is preserved for trial.

We note, however, that "[f]inding secondary meaning is not the end of the enquiry, but only the beginning." MCCARTHY, *supra* n.2, at 11:82. On remand, several issues must still be resolved by the district court. These include the remaining elements that Herman Miller must establish to prove a

### 1. Direct consumer testimony

Herman Miller provides affidavit evidence from design experts, authors, historians, and past and present Herman Miller employees to support its claim that consumers associate the Eames lounge chair and ottoman with Herman Miller. In addition, Herman Miller presents media coverage relating to individuals who specifically own Herman Miller Eames lounge chairs and ottomans and producers of television shows that specifically purchased Herman Miller Eames lounge chairs and ottomans for their sets. Herman Miller also has presented evidence of a extensive secondary market specifically in Eames lounge chairs and ottomans produced by Herman Miller. Finally, Herman Miller has presented various magazine and newspaper articles warning the consuming public seeking a Herman Miller Eames lounge chair and ottoman of the existence of a market for knockoffs of Eames-designed furniture.

Direct consumer testimony "need not take the form of explicit testimony from consumers stating that 'I care that X produced this product.'" *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 294 (7th Cir. 1998). Instead of this explicit testimony, Herman Miller has presented a variety of circumstantial testimony indicating a link between Herman Miller and the Eames lounge chair and ottoman in the mind of the consuming public for modern furniture. In concluding that the plaintiff presented sufficient evidence of secondary meaning in *TrafFix*, this court noted the lack of direct customer testimony, but instead relied upon deposition testimony of employees of the defendant and former employees of the plaintiff indicating they could recognize the plaintiff's sign, which was the subject of the disputed trade dress claim. 200 F.3d at 937. The evidence in this case relating to a connection between Herman Miller and the Eames lounge chair and ottoman among the consuming public is even more extensive.

### 2. Consumer surveys

The district court particularly noted the absence of consumer studies or surveys linking the lounge chair and ottoman with Herman Miller.[5] "Because the determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence. *Survey evidence is not the only relevant evidence, however*." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999) (internal citation and quotations omitted) (emphasis added). Other courts have held that plaintiffs presented sufficient evidence of secondary meaning at summary judgment without consumer surveys. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 165-66 (3d Cir. 2000); *TrafFix*, 200 F.3d at 937; *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1583 (Fed. Cir. 1988); *Hunting Hall of Fame Found. v. Safari Club Int'l*, 6 U.S.P.Q.2d 1765, 1771 (D. Ariz. 1987). While consumer surveys certainly would have been helpful to Herman Miller's claim, their absence is not fatal, at least on summary judgment.

---

[5] To support this factor, Herman Miller presents evidence from a trade publication in which the Eames lounge chair appeared in a quiz featuring sixteen famous corporate designs. Readers were asked to match the silhouette of a logo with the company or brand with which it had "become synonymous." This was not a survey, however. If anything, it qualifies as evidence of direct consumer testimony, along with the other testimony that Herman Miller has provided. However, we must give it little weight, because the correct answer matching the silhouette of the lounge chair was "Eames lounge chair." There was no mention of Herman Miller in the quiz. To support its use of this evidence, Herman Miller relies upon the conclusory statement of the publisher of the quiz, that "the EAMES lounge chair and ottoman is so closely associated with Herman Miller, Inc., that the chair was only referred to as the EAMES lounge chair."

that secondary meaning was demonstrated by evidence that the defendant intentionally copied Ferrari's car design, as well as affidavits from two magazine editors and consumer surveys supporting the proposition that the car design was associated with Ferrari. 944 F.2d at 1240. Although Herman Miller does not present consumer surveys, it does provide the other evidence relied upon in *Ferrari* and an abundance of additional evidence. Moreover, consumer surveys, while helpful, are not a prerequisite to establishing secondary meaning. Indeed, in *TrafFix* there were no consumer surveys in the record and limited direct consumer testimony, yet this court held that there was sufficient evidence for a reasonable juror to conclude that the WindMaster traffic sign stand had obtained secondary meaning in the marketplace. *See also*

---

Miller.

Although it certainly would strengthen Herman Miller's position, caselaw does not support Herman Miller's argument. While the law allows secondary meaning to be established by demonstrating that the public is aware that the product comes from an *anonymous* source, there must be evidence indicating that it is a *single, anonymous* source. *See Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 856 (7th Cir. 1982). In *Processed Plastic*, the court granted a preliminary injunction in favor of Warner Communications against a company that produced toy cars related to the television show the *Dukes of Hazzard*. The court ruled that the public associated the *Dukes of Hazzard* with a single, though perhaps anonymous, source, Warner Communications. *See ibid.*

Herman Miller must demonstrate that when the buying public recognizes the lounge chair and ottoman as "an Eames," it recognizes that "an Eames" comes from one source – one anonymous manufacturer. The evidence that Herman Miller presents simply associating the lounge chair and ottoman with the Eameses, and not Herman Miller, fails to indicate that in the mind of the consuming public the furniture is connected with a single, though anonymous, source that manufacturers it. Although Herman Miller and the Eames estate are well aware of the relationship between the Eameses and Herman Miller, this does not automatically mean that a member of the consuming public searching for "an Eames" is aware of this relationship.

material fact as to whether the "consuming public" would identify the Eames lounge chair and ottoman with Herman Miller. Specifically, Herman Miller provides the following pieces of evidence to support its claim: (1) books, articles, and an encyclopedia listing specifically indicating Herman Miller as the source of the Eames lounge chair and ottoman; (2) facts indicating that Palazzetti intentionally copied the Eames lounge chair and ottoman manufactured by Herman Miller; (3) affidavit testimony regarding the connection between the lounge chair and ottoman and Herman Miller, both in general and in the mind of the consuming public; (4) unsolicited media attention regarding the relationship between Herman Miller and the Eameses; (5) articles regarding owners of Herman Miller Eames lounge chairs and ottomans; (6) the existence of a secondary market specifically in Herman Miller Eames lounge chairs and ottomans; (7) articles warning consumers about knockoffs of Eames-designed furniture and describing Herman Miller as the source of the Eames lounge chair and ottoman; (8) sales of 100,000 Herman Miller Eames lounge chairs and ottomans; and (9) continuous production of the Herman Miller Eames lounge chair and ottoman since 1956.

Taken together, Herman Miller has produced sufficient evidence to create a genuine issue of material fact as to the protectability of its trade dress.[7] In *Ferrari*, this court held

---

[7]We base our decision solely on evidence that Herman Miller presented *specifically* relating to the connection between Herman Miller and the Eames lounge chair and ottoman. Herman Miller presents a great deal of evidence recognizing the lounge chair and ottoman as "an Eames," but not necessarily as "a Herman Miller." Herman Miller claims that this makes no difference since all that is significant is that purchasers associate the trade dress with "a single source." *See Can Am Eng'g Co. v. Henderson Glass, Inc.*, 620 F. Supp. 596, 603 (E.D. Mich. 1985), *aff'd*, 814 F.2d 253, 258 (6th Cir. 1987). Herman Miller notes that the Eameses designed furniture exclusively for Herman Miller and that the Eames estate recognizes that Herman Miller possesses any legal rights related to the Eameses. In effect, Herman Miller is arguing that Eames = Herman

---

### 3. *Exclusivity, length, and manner of use*

In contrast to other Eames-designed products that Herman Miller discontinued producing either temporarily or permanently, Herman Miller has produced the Eames lounge chair and ottoman continuously since 1956. This court has noted that, "[t]he duration of use of the mark can establish secondary meaning where the duration is more than a relatively short period."[6] *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). In this case, Herman Miller has presented evidence that it has used the Eames lounge chair and ottoman trade dress for far more than a relatively short period.

### 4. *Amount and manner of advertising*

Although Herman Miller does not present evidence of direct advertising expenditures, it provides evidence of publicity it received through "unsolicited media coverage." *See Centaur*, 830 F.2d at 1222. Quoting *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1453 (3d Cir. 1994), the district court rejected this evidence on the basis that it "reflect[s] interest more in an unusual product [or individual] than in the source of the product." (brackets added in district court opinion). As the district court properly noted, a great deal of the media attention that Herman Miller relies upon highlights the fact that Charles and Ray Eames designed the lounge chair and ottoman, *not* the fact that Herman Miller sells the furniture. However, many of the articles mentioned that the Eameses produced the furniture for Herman Miller and some of the articles discussed the relationship between Herman Miller and the Eameses. In this sense, the design partnership between Herman Miller and the Eameses

---

[6]As noted above, cases analyzing trademark issues can be relied upon in trade dress cases since trade dress issues follow the same rules and laws as trademark issues. *See supra* note 2.

generated unsolicited advertising for Herman Miller that helped reinforce the relationship between Herman Miller and the Eameses in the mind of the consuming public. The district court erred in rejecting all of the evidence Herman Miller presented as to this factor.

### 5.  *Amount of sales and number of customers*

Herman Miller provides evidence that over 100,000 lounge chairs and ottomans have been sold by Herman Miller since the introduction of the lounge chair and ottoman in 1956. The district court discounted this evidence on the basis that sales success alone does not establish the necessary consumer association between the furniture and it source. *See Appalachian Log*, 871 F.2d at 596 ("Sales volume, though relevant, is not necessarily sufficient to indicate recognition of the mark by purchasers as an indication of the source."). The court stated that evidence of sales success is not particularly useful in the absence of other evidence because sales success could be related to factors other than secondary meaning, such as good design or aesthetic edification. *See Duraco Prods.*, 40 F.3d at 1452. The facts indicate, however, that Herman Miller presented a variety of evidence supporting secondary meaning *in addition to* the amount of Eames lounge chairs and ottomans it has sold. Therefore, this figure cannot be dismissed and adds support to Herman Miller's claim.

### 6.  *Established place in the market*

There is no market-share information presented. Herman Miller presents evidence from affidavits, books, magazines, and an encyclopedia entry specifically stating that Herman Miller is the source for the Eames lounge chair and ottoman. In addition, Herman Miller presents evidence that there is a strong secondary market for used Herman Miller Eames lounge chairs and ottomans and that customers within this secondary market recognize that Herman Miller is the only

source for the lounge chair and ottoman. Finally, Herman Miller offers articles describing the market in reproductions of Eames-designed furniture and describing Herman Miller as the source of the original Eames lounge chair and ottoman.

### 7.  *Proof of intentional copying*

Herman Miller has provided deposition testimony demonstrating that Palazzetti boasted that its copy of the lounge chair and ottoman matches "as closely as possible" the "original" Herman Miller design. In addition, Herman Miller points to evidence from Palazzetti publications including "Eames" in the identification of the lounge chair and ottoman. This evidence is especially helpful to establishing secondary meaning "because 'there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *Ferrari*, 944 F.2d at 1239 (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960)); *see also Osem Food Industries Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990) ("When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied.").

* * *

Herman Miller has presented sufficient evidence to create a genuine issue of material fact as to whether the lounge chair and ottoman have acquired secondary meaning. Secondary meaning is proven, when, by a preponderance of the evidence, "it can be determined that the attitude of the consuming public toward the mark denotes a single thing coming from a single source." *Appalachian Log*, 871 F.2d at 596 (citation and internal quotations omitted). Herman Miller has presented sufficient evidence to raise a genuine issue of