Anthony J. DEGIDIO, Plaintiff,

v.

WEST GROUP CORP.,
et al., Defendant.

No. 3:99 CV 7510.

United States District Court,
N.D. Ohio,
Western Division.

March 18, 2002.

Anthony J. DeGidio, Calamunci, Groth & Joelson, Toledo, for Anthony J. DeGidio, Plaintiffs.

Carol Witschel, White & Case, Jennifer L. Johnson, White & Case, New York, NY, Richard M Kerger, Kerger & Kerger, Toledo, Robert L. Raskopf, White & Case, Shannon M. Hudnall, White & Case, New York, NY, for West Group Corporation, Thomson Corporation, The, West Licensing Corporation, Defendants.

## MEMORANDUM OPINION

KATZ, District Judge.

Pending before this Court are cross-motions for summary judgment filed by Defendants, West Group Corporation, The Thompson Corporation, and West Licensing Corporation ("Defendants" or "West"), and Plaintiff Anthony DeGidio ("DeGidio"), who is proceeding pro se in the above-captioned matter. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a). Based upon careful consideration of the parties' respective motions, oppositions, and replies, and the entire record herein, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment (Doc. No. 50). The Court will deny Plaintiff's Motion for Summary Judgment (Doc. No. 55) in its entirety.

## I. BACKGROUND

Plaintiff is the registrant of the domain name "lawoffices.net" and alleged founder and owner of the corresponding website, which provides an attorney directory, legal information relating to cyberlaw issues, a vanity email service, listings of domain names for sale, and a hosting service for legal related websites. In the instant action, Plaintiff asserts trademark protection for the designation LawOffices.net,[1] which is the moniker attached to the website lawoffices.net. However, Plaintiff does not own either a federal or state registration for the LawOffices.net designation. The essential features of Plaintiff's putative trademark are: (1) a capitalization of the letters "l" and "o;" (2) pluralization of "lawoffice;" and (3) placement of the term "LawOffices.net" in black font in a horizontal rectangular box that is shaded in marbled white and light gray.[2]

Defendants utilize the designation *Law* office.com and the domain name "lawoffice.com"[3] to market the West Legal Directory, described by Defendants as "a 'one-stop' online resource for useful information pertaining to law and lawyers for businesses, professionals and consumers." Defs.' Mot. Summ. J. at 5. Defendants' website offers information on over four hundred legal topics, a directory of attorneys and other legal professionals, an online searchable legal dictionary, and a frequently asked questions section. *See id.* at 5–6. In addition to the aforementioned services, West also offers fee-based services, including email, website creation and hosting, and sponsorship packages. *See id.* However, these fee-based services are not advertised at the *Law* office.com website. *See id.* The essential features of the designation *Law* office.com are: (1) capitalization of the letter "l;" (2) singular, as opposed to plural, "lawoffice;" (3) italiciza-

---

**1.** Plaintiff refers alternatively to the designation LawOffices.net as a trademark and a service mark. For clarity of analysis, the Court notes that it utilizes the terms "mark" or "trademark" to refer to the parties' designations. Nonetheless, the Court recognizes that the Lanham Act provides separate definitions for "trademark" and "service mark." Trademarks identify goods, while service marks identify "intangible activities, which are performed by one person for the benefit of a person or persons other than himself, either for pay or otherwise." Trademark Manual of Examining Procedure ("TMEP") § 102. A service mark is defined as "any word, name, symbol, or device, or any combination thereof used by a person ... to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services." 15 U.S.C. § 1127. However, analytical principles that apply to trademarks apply with equal force to service marks.

**2.** Plaintiff's mark appears on the website lawoffices.net as follows:

**3.** Lawoffice.com is redirected to a FindLaw directory page at http://directory.findlaw.com.

tion of "law;" (4) placement of *Law* office.com in white font in a dark blue rectangular box; (5) a multicolored open door emblem situated over the "dot;" and (6) the text "from West Legal Directory" placed in smaller white font beneath *Law* office.[4] *See* Defs.' Mem. P. & A. at 19.

Plaintiff asserts that Defendants' use of the designation *Law* office.com in conjunction with the website lawoffice.com infringes upon his alleged rights in the designation LawOffices.net and the affiliated lawoffices.net website. Specifically, Plaintiff pleads seven causes of action, alleging: (1) violations of the Ohio Deceptive Trade Practices Act, OHIO REV. CODE ANN. §§ 4165.01–4165.04 (Anderson 1998 & Supp.2000); (2) unauthorized use of a trademark pursuant to OHIO REV. CODE ANN. § 1329.65 (Anderson 1993 & Supp. 2000);[5] (3) common law unfair competition; (4) false designation of origin pursuant to 15 U.S.C. § 1125(a); (5) trademark dilution pursuant to 15 U.S.C. § 1125(c); (6) common law dilution; and (7) common law misappropriation.

Defendants have moved for summary judgment, asserting *inter alia* that the "designation LawOffices.net is descriptive, devoid of secondary meaning, and therefore not entitled to trademark protection." Defs.' Mem. P. & A. at 1. Defendants also argue that even if this Court determines that there is a genuine factual dispute as to the trademark status of the designation of LawOffices.net, Plaintiff still cannot prevail on his dilution claims because he cannot establish that his mark is famous. Defendants further assert that Plaintiff cannot maintain his Ohio state law claims

because he does not own an Ohio registration for the LawOffices.net designation.

Plaintiff not only opposes Defendants' motion, but also has moved for summary judgment on Counts I–IV; however, Plaintiff maintains that there are "serious factual disputes regarding the fifth through seventh claims and they are thus inappropriate for summary judgment." Pl.'s Mot. Summ. J. at 6.

## II. DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is just as appropriate in a trademark infringement case as in other litigation and is granted or denied on the same principles." *Freed v. Farag,* 994 F.Supp. 887, 889 (N.D.Ohio 1997) (citing *WSM, Inc. v. Tenn. Sales Co.,* 709 F.2d 1084, 1086 (6th Cir.1983); *SCI Sys., Inc. v. Solidstate Controls, Inc.,* 748 F.Supp. 1257, 1260 (S.D.Ohio 1990)). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genu-

**4.** The disputed mark no longer appears on Defendants' website. However, until recently, Defendants' mark appeared on the website lawoffice.com as follows:

**5.** In Plaintiff's Motion for Summary Judgment, Plaintiff purports to withdraw this

ine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. GMC,* 201 F.3d 800, 802 (6th Cir.2000). Summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap,* 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987)). "The Court is not required or permitted, however, to judge the evidence or make findings of fact." *Id.* The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must deter-

mine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Atchley v. RK Co.,* 224 F.3d 537, 539 (6th Cir.2000).

### B. Overview of Plaintiff's Claims

As a preliminary matter, Defendants assert, and Plaintiff does not contest, that in order to prevail on any of his claims, Plaintiff must first establish that the designation LawOffices.net is indeed a valid and legally protectable trademark. The Court agrees with this assertion, at least with respect to Counts I–VI, and thus begins its analysis of these claims with an inquiry as to the validity of Plaintiff's designation. *See Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.,* 270 F.3d 298, 308 (6th Cir.2001); *Am. Online, Inc. v. AT & T Corp.,* 243 F.3d 812, 819 (4th Cir.2001) (explaining that plaintiff asserting rights to unregistered mark carries the burden of establishing "that it has a valid, protectable trademark and that the defendant is infringing its mark"); *Sunbeam Products Inc. v. The West Bend Co.,* 123 F.3d 246, 251 (5th Cir.1997), *overruled in part on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:14 at 27–27 (4th ed.2001). As discussed below, these claims are analyzed pursuant to federal trademark principles.

As to Count VII, common law misappropriation, Defendants argue that the Court should analyze this claim as an unfair competition claim. However, Plaintiff does not premise this claim upon the alleged infringement of his putative common law

claim. *See* Pl.'s Mot. Summ. J. at 21 (stating that "Plaintiff agrees with defendants analysis of Count II and hereby withdraws this claim").

trademark. Instead, Plaintiff asserts a claim for misappropriation of the "trade value" of the lawoffices.net designation and website. Therefore, the Court disagrees with Defendants' assertion that this claim is subject to the trademark analysis applicable to Plaintiff's other claims.

■ As indicated *supra* note 5, Plaintiff has withdrawn Count II and the Court does not undertake an analysis of this claim. However, given the procedural oddity created by Plaintiff's failure to formally amend his complaint to withdraw this cause of action, the Court makes clear that Defendants are entitled to summary judgement on this count. In order to sustain his cause of action in Count II, Plaintiff must own a *registered* trademark, *see* OHIO REV. CODE ANN. § 1329.66, and Plaintiff has not fulfilled this requirement.

## C. Counts I–VI

Defendants assert that Plaintiff's mark is not entitled to protection, in part because Plaintiff does not own either a federal or Ohio state registration for his mark. Plaintiff counters that "[t]he Lanham Act offers protection against infringement of registered and unregistered marks." Pl.'s Mot. Summ. J. at 7 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Plaintiff further asserts that unregistered marks qualify for protection under Ohio statutory and common law because courts analyze those claims under analogous federal principles, which provide protection for qualifying unregistered marks. Defendants also assert that Plaintiff's mark is

not protectable because it is classified as "descriptive" and has not acquired the secondary meaning required to confer trademark protection. Plaintiff asserts that his mark is "suggestive" rather than "descriptive," but alternatively argues that should the Court find that the mark is descriptive, it has acquired the secondary meaning necessary to confer trademark protection.

As discussed below, Plaintiff is correct in his assertions as to the protectability of unregistered marks. The Lanham Act, as well as Ohio statutory and common law, provide trademark protection for certain unregistered marks. However, that does not resolve the issue of whether Plaintiff owns a valid and legally protectable unregistered designation. In order for a mark to benefit from trademark protection, it must be of a type that is entitled to protection. As discussed below, the Court determines that Plaintiff's mark is not entitled to protection because it is descriptive and devoid of secondary meaning.

### 1. Unregistered marks are eligible for trademark protection

■ While federal registration generally confers a presumption of trademark validity, *see Burke–Parsons–Bowlby v. Appalachian Log Homes*, 871 F.2d 590, 593 (6th Cir.1989), it is nonetheless "settled that § 43(a) of the Lanham Act protects qualifying unregistered marks, and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are generally applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." [6] *Boston*

---

**6.** Section 43(a) of the Lanham Act provides in relevant part:

Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, ... or any false designation of origin ... which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to ... the

origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

*Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir.1993) (citing *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753).

█ In analyzing trademark claims alleged under Ohio law, courts employ the same analysis as when considering analogous federal claims. *See Allard Enters., Inc. v. Advanced Programming Res., Inc.,* 146 F.3d 350, 354–55 (6th Cir.1998); *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1431 (S.D.Ohio 1990) (explaining that "an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act"). Federal trademark principles are applied as well to analogous common law claims. *See Daddy's Junky Music v. Big Daddy's Family Music,* 109 F.3d 275, 288 (6th Cir. 1997); *Worthington Foods,* 732 F.Supp. at 1431. Based upon these principles, Ohio courts have acknowledged that qualifying unregistered marks are eligible for state statutory and common law protection. Therefore, the fact that Plaintiff has not registered his mark does not preclude the mark from qualifying as a protectable trademark. However, whether Plaintiff's mark qualifies for trademark protection is determined by where the mark falls along the established spectrum of distinctiveness. *Boston Beer Co.,* 9 F.3d at 180 (explaining that "[a] court's inquiry into whether a term merits trademark protection starts with the classification of that term along the spectrum of 'distinctiveness' ").

### 2. Classification of Plaintiff's mark

### a. Categories of trademark classification

█ There are two basic categories into which putative trademarks fall: (1) those that are inherently distinctive, and (2) those that have acquired distinctiveness through secondary meaning.[7] *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. As explained by Professor McCarthy:

> Within the two basic categories are subcategories that form the complete spectrum of distinctiveness of marks. Arrayed in an ascending order roughly reflecting their eligibility to trademark status and the degree of protection afforded, the categories are: (1) generic terms; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. Generic terms can never be trademarks, descriptive terms are not inherently distinctive and suggestive, arbitrary and fanciful terms are regarded as being inherently distinctive.

2 McCarthy § 11:2.

"A generic term is ... used to commonly describe the relevant type of goods or services." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir.1996). Terms that are generic, such as "aspirin" or "light beer," are the weakest type mark and are not entitled to any trademark protection. *See id.* Marks that are arbitrary or fanciful are entitled to the highest degree of trademark protection. As explained in *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.:*

7. As explained by the Supreme Court:

> [D]escriptive marks may acquire the distinctiveness which will allow them to be protected under the Act. Section 2 of the Lanham Act provides that a descriptive mark that otherwise could not be registered under the Act may be registered if it "has become distinctive of the applicant's goods in commerce." §§ 2(e), (f), 15 U.S.C. §§ 1052(e), (f). This acquired distinctiveness is generally called "secondary meaning." The concept of secondary meaning has been applied to actions under § 43(a). *Two Pesos,* 505 U.S. at 770, 112 S.Ct. 2753 (citations omitted). Secondary meaning is further discussed *infra* Part II.C.3.

"An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached," such as CAMEL cigarettes or APPLE computers. *Id.* "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned," such as EXXON or KODAK. *Id.* 931 F.2d 1100, 1112 (6th Cir.1996) (quoting *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir.1987)).

In the instant action, the parties do not argue that Plaintiff's mark is either generic, or arbitrary or fanciful, and it is clear from the established definition of these classifications that Plaintiff's mark does not fall within these categories. The crux of the parties' dispute is whether Plaintiff's mark is descriptive or suggestive.

█ "A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer to use imagination and perception to determine the nature of the goods." *Worthington Foods*, 732 F.Supp. at 1433 (quotation and citation omitted). "Examples are CITIBANK, which connotes an urban or modern bank, or GOLIATH, for wood pencils, connoting a large size." *Homeowners*, 931 F.2d at 1112. "A suggestive term is considered stronger than one that is merely descriptive, and does not require proof of secondary meaning." *Id.*

█ "A trademark is descriptive 'if it describes: the intended purpose, function or use of the goods; the size of the goods; the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user.'" *Worthington Foods*, 732 F.Supp. at 1433 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir.1988)). If a mark directly conveys information about the "characteristics, functions, or qualities" of the product or service to which it is attached, then the mark is descriptive. *Id.* "Examples of descriptive marks are BEST, SUPERIOR, and PREFERRED." *Homeowners*, 931 F.2d at 1112; *see also Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.* 33 F.Supp.2d 488, 494 (E.D.Va.1999) (giving examples of " 'After Tan' post-tanning lotion, '5 Minute' glue, and the 'Yellow Pages' telephone directory"). A mark "cannot escape from the descriptive category simply because it does not bring to mind any one product when scrutinized in the abstract." *Id.* at 1434. A descriptive mark may be entitled to protection only if it has acquired secondary meaning, *i.e.*, if it has come to distinctively identify the *source* of a particular good or service, as opposed to merely identifying the product or service itself. *See id.*

### b. The descriptive-suggestive distinction

█ Defendants submit that Plaintiff's mark is at best descriptive, but nonetheless not entitled to protection because it is devoid of secondary meaning. Plaintiff counters that his mark is properly categorized as suggestive, therefore eliminating the need for a showing of secondary meaning. Alternatively, Plaintiff asserts that his mark, if distinctive, has acquired the requisite secondary meaning.

Defendants submit that LawOffices.net "is merely descriptive because it is not inherently distinctive and merely describes the intended function of the services he provides, *i.e.*, legal services and information for lawyers and persons looking for lawyers or legal services." Defs.' Mem. P. & A. at 9. Plaintiff counters that his mark would be descriptive "if used to refer solely to a service which consisted of law offices," Pl.'s Mot. Summ. J. at 10, but argues that his designation is suggestive, because "no reasonable person could auto-

matically reach the conclusion that a website named lawoffices.net included vanity email services, web hosting, domain name law, a directory of domain names for sale and a public access database of attorneys." *Id.* at 10–11. Plaintiff argues that LawOffices.net must be regarded as suggestive because "[s]ome imagination or perception of the site is required to understand the service's full nature." *Id.*

Realistically, Plaintiff's mark has characteristics of both classifications. The mark certainly has a descriptive element to it, as LawOffices.net conveys the message that the services provided by Plaintiff are those that one typically would find in a law office, or through a network of law offices, such as an attorney directory and topical legal advice. On the other hand, LawOffices.net is ostensibly suggestive, at least insofar as related to the domain name sales, website hosting, and vanity email service. Often there is a fine line between suggestive and descriptive marks, and Plaintiff's mark appears to fall within the area of ambiguity between the two classifications. To properly classify Plaintiff's mark, the Court gleans guidance from six factors compiled by Professor McCarthy, and used by other courts, for distinguishing between suggestive and descriptive marks. *See, e.g., Worthington* Foods, 732 F.Supp. at 1435. These factors are:

(1) How much imagination on the buyer's part is required in trying to cull a direct message about the quality, ingredients or characteristics of the product or service? [I]t must be kept in mind that the ordinary consumer does not spend much time in the marketplace lingering over such problems. On the other hand, if the potential buying class at issue are experts or professionals, a more critical examination is reasonable.

(2) Does the mark directly convey a real and unequivocal idea of some characteristic, function, quality or ingredient of the product or service to a reasonably informed buyer? ... Is some reflection or multi-stage reasoning process necessary to cull direct information about the product from the term used as a mark?

(3) Does the mark so closely tell something about the product or service that other sellers of like product would be likely to want to use the term in connection with their goods? [W]ithout any prior knowledge of this mark, [would] others ... be likely to want to use it to describe their products?

(4) Are ... other sellers now using this term to describe their products? Even if the mark is descriptive and has attained secondary meaning, if many others in other product markets are using this term, the mark may be labelled "weak" and entitled only to narrow protection.

(5) Even though the mark may tell something about the goods or services, is it just as likely to conjure up some other, purely arbitrary connotation? E.g., SUGAR & SPICE baked goods, or POLY PITCHER plastic pitchers.

(6) How does the mark fit into the basic concept that descriptive marks cannot pinpoint one source by identifying and distinguishing only one seller? That is, are buyers likely to regard the mark really as a symbol of origin, or merely as another form of self-laudatory advertising?

2 MCCARTHY § 11:71. Professor McCarthy cautions that "a term that is in one category for a particular product may be in a quite different category for another product." *Id.* Professor McCarthy also advises that "[t]he proper categorization will vary with the relationship between the term and the product or services." *Id.*

In regard to the first factor, there is not a high degree of imagination that a typical buyer must employ to imagine the nature of Plaintiff's services, particularly in light

of the sophistication level of the attorneys and other consumers likely to utilize such a website. Although Plaintiff asserts that vanity email services, website hosting, domain name sales, and a searchable public access database are not features that are readily apparent to most users, it does not require a vast cognitive leap to imagine that Plaintiff would provide such services, given that the very type of practice in which Plaintiff is engaged, cyberlaw and intellectual property, is closely related to these services. Therefore, the Court finds that the first factor weighs, albeit only slightly, in favor of classification as a descriptive mark. However, the Court does find that in regard to factor two, it would require of most consumers a multi-staged reasoning process "to cull some direct information" about Plaintiff's services. Even a sophisticated buyer, while readily associating LawOffices.net with Plaintiff's legal services, might not readily associate LawOffices.net with the provision of vanity email addresses and information related to domain name sales. When encountering the designation LawOffices.net, one would likely first consider the types of services provided by a typical law office, such as legal services, attorney referrals, and topical legal advice. Only upon reflection of Plaintiff's specific practice is one likely to arrive at the conclusion that Plaintiff also provides vanity email and webhosting. Therefore, the Court finds that the second factor weighs in favor of classification as a suggestive mark.

In regard to the third factor, the Court need not speculate as to whether "others would be likely to want to use [the mark] to describe their [own] products," 2 McCARTHY § 11:71, because others obviously have utilized permutations of LawOffices.net in order to represent their own suite of legal services.[8] As to factor four, the wide third-party use of similar marks suggests that Plaintiff's mark is "'weak' and entitled only to narrow protection." 2 McCARTHY § 11:71. Therefore, the Court finds that the third and fourth factors weigh in favor of classification as a descriptive mark.

With respect to the fifth factor, Plaintiff does not submit that his mark is likely to "conjure up some other, purely arbitrary connotation," 2 McCARTHY § 11:71, and the Court does not find that the designation LawOffices.net suggests anything arbitrarily unrelated to Plaintiff's services. As noted above, even if most law offices do not arguably offer a vanity email service and information on domain name sales, the instant balancing test is to be applied in light of the "relationship between the term and the product or services." *Id.* Given that Plaintiff's practice is focused on cyberlaw and intellectual property issues, it is not arbitrary for one to draw an association between LawOffices.net and the email and domain name services, in the particular context in which the mark is used. Therefore, the Court finds that the fifth factor weighs in favor of classification as a descriptive mark.

As to the sixth factor, the Court concludes that potential customers are not likely to view Plaintiff's mark as a distinctive symbol of origin, as is evidenced by the wide third-party use of similar marks. Even assuming that Plaintiff's mark is distinctive enough to compel some consumers to associate LawOffices.net only with his services as opposed to the multitude of other legal professionals offering similar services using similar designations, the Court nonetheless finds that the above factors *in toto* weigh in favor of classification

---

**8.** The parties' submissions reveal wide third-party use of variants of "lawoffice" in business names and websites.

**914**

of Plaintiff's mark as descriptive, as opposed suggestive.

In sum, Plaintiff's mark is at best descriptive, and entitled to protection only if Plaintiff can establish that the mark has acquired secondary meaning in the marketplace.

### 3. Secondary meaning

■ "Secondary meaning is used generally to indicate that a mark or dress 'has come through use to be uniquely associated with a specific source.'" *Two Pesos,* 505 U.S. at 766 n. 4, 112 S.Ct. 2753. To establish secondary meaning, Plaintiff "must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). "To acquire secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source[.]' [T]he article must proclaim its identification with its source, and not simply stimulate inquiry about it." *Herman Miller,* 270 F.3d at 311.

■ Courts in this Circuit evaluate seven factors to determine whether a mark has acquired secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Mktg. Displays, Inc. v. TrafFix Devices, Inc.,* 200 F.3d 929, 937 (6th Cir. 1999), *rev'd on other grounds* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).

"[I]t is the party seeking protection of a mark who bears the burden of proving that secondary meaning has attached." *Boston Beer Co.,* 9 F.3d at 182 (citing *Bristol–Myers Squibb Co. v. McNeil– P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir. 1992); *Blinded Veterans Assoc. v. Blinded Am. Veterans Found.,* 872 F.2d 1035, 1041 (D.C.Cir.1989)).[9] "The evidentiary burden necessary to establish secondary meaning is substantial." *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.,* 871 F.2d 590, 596 (6th Cir.1989). Secondary meaning is established when a preponderance of the evidence demonstrates "that the attitude of the consuming public toward the mark denotes 'a single thing coming from a single source.'" *Id.* at 596 (quoting *Aloe Creme Labs. v. Milsan, Inc.,* 423 F.2d 845, 849 (5th Cir.1970)). The best evidence of secondary meaning is direct evidence; however, such evidence rarely is available. *See id.; Libbey Glass, Inc. v. Oneida Ltd.,* 61 F.Supp.2d 700, 707 (N.D.Ohio 1999). Therefore, courts often draw inferences from the above factors. *See id.*

#### i. Consumer testimony

In regard to consumer testimony, Plaintiff has provided the Court with the affidavits of three people who have visited the lawoffices.net website. *See* Pl.'s Mot. Summ. J. Ex. 8–10. The affiants all state that they have visited the lawoffices.net website and that all noticed Plaintiff's putative mark on the website during their respective visits. One affiant utilized the attorney database. Another affiant subscribed to Plaintiff's vanity email service and testifies that he finds the service useful. After visiting Plaintiff's website, the third affiant sought to exchange website links. Notably, Plaintiff does not offer

9. Plaintiff incorrectly asserts that Defendants have the burden of establishing that their

mark has acquired secondary meaning. *See* Pl.'s Reply at 12.

testimony from a single customer who states that he associates LawOffices.net solely with Plaintiff or that he visited the lawoffices.net website because he identified the moniker with a particular source of services. Admittedly, "direct consumer testimony 'need not take the form of explicit testimony from consumers stating that I care that X produced this product.'" *Herman Miller*, 270 F.3d at 312 (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 294 (7th Cir.1998)). However, the Court does not equate a declaration of use, or even utility of the Plaintiff's website and services, with LawOffices.net having become associated with a single, particular source. To buttress his position, Plaintiff offers statistics indicating the ranking of the lawoffices.net website on particular search engines. However, Plaintiff fails to explain how such information indicates that consumers associate the designation LawOffices.net with a single source of services.

### ii. Consumer surveys

██ Survey results "are 'considered the most direct and persuasive' evidence of secondary meaning." *Libbey Glass*, 61 F.Supp.2d at 707. Unfortunately, the parties have not offered survey evidence to support their motions.

### iii. Exclusivity, length, and manner of use

██ In mistaken reliance upon a Supreme Court case addressing the 15 U.S.C. § 1052(f) [10] statutory presumption of distinctiveness that accrues after five years of exclusive and continuous use, Plaintiff asserts that he "has been using the mark since 1996 so the third factor would weigh in his favor." Pl.'s Mot. Summ. J. at 14 (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). This presumption is of no benefit to Plaintiff because the five year time period is measured from "the date on which the claim of distinctiveness is made," and the owner of a descriptive mark must demonstrate that the mark acquired secondary meaning *before* its first use by alleged infringer. *Burke*, 871 F.2d at 596; *see also Ashland Oil, Inc. v. Olymco, Inc.*, 64 F.3d 662 1995 WL 499466, at *1 (6th Cir. Aug.21, 1995) (affirming decision in which district court assessed date of claim of distinctiveness as arising from defendant's first use). When West launched its website in June 1999, Plaintiff had used his mark for only three years. Duration of use must be of "more than a relatively short period" to establish secondary meaning. *Burke*, 871 F.2d at 597 (noting that three years has been determined as insufficient to establish secondary meaning).

Moreover, while Plaintiff addresses the length of use element, he does not adequately address the other two elements in this prong of the test, *i.e.*, exclusivity and continuity of use. In regard to continuity of use, Defendants note certain time periods when the lawoffices.net website was inoperable. However, the Court not does accord much weight to this argument and does not take issue with Plaintiff's assertion that he has used the designation LawOffices.net continuously since 1996.

Regarding exclusivity of use, Defendants assert that the wide third party use of domain names and designations including the phrase "law office(s)" weighs against a

---

**10.** The statute provides in relevant part:
The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made. 15 U.S.C. § 1052(f).

finding of secondary meaning. Both sides have submitted information, including telephone directory listings and website search engine results, indicating that there are numerous organizations and websites utilizing the term "lawoffice" to represent their business. The wide-spread third-party use, coupled with the short duration of use by Plaintiff, weighs against a finding for Plaintiff on this factor. *See Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1269 (7th Cir.1989) ("third party use of a substantially similar mark to promote the same goods or services to the same consumer class weighs against a finding that the consumer class associates the mark with one source").

### iv. Amount and manner of advertising

Plaintiff has spent $2,500 over four years to advertise and promote his website. Defendants argue that Plaintiff's advertising expenditures are limited in regard to both dollar amount and scope. In support of their position, Defendants maintain that Plaintiff "has not engaged in direct mail, print, radio or television advertising of the LawOffices.net Web site." Defs.' Mem. P. & A. at 4.

"Advertising and sales volume, while relevant, are not sufficient, without more, to establish secondary meaning." *Libbey Glass*, 61 F.Supp.2d at 708 (citing *Burke*, 871 F.2d at 596). "Where advertising expenditures are required to 'merely survive' in the competitive market, advertising expenditures cannot be used to prove secondary meaning." *Burke*, 871 F.2d at 596. While Plaintiff has spent $2,500 on advertising, he does not establish that these expenditures are extensive, nor that the expenditures are beyond that necessary for market survival. *See id.* (only "*extensive* advertising which results in consumer association with a single source" established secondary meaning). Plaintiff nonetheless asserts that he "has shown exten-

sive recognition in internet search engines and other ranking sites." Pl.'s Mot. Summ. J. at 14. However, Plaintiff does not explain how this information is relevant to establishing that customers associate LawOffices.net with a single source of services. *See Shade's Landing, Inc. v. Williams*, 76 F.Supp.2d 983, 989–90 (D.Minn.1999) (rejecting "high placement of plaintiff's web site in search engine listings" as evidence that consumers associated plaintiff's services with plaintiff's mark).

### v. Amount of sales and number of customers

Defendants submit that Plaintiff has earned no revenue from services he provides through his website, that he has never had a paying customer, has never had any employees, and has earned less that $200 in revenue from banner advertisements and click-through revenues. Plaintiff offers the affidavits from three people who have accessed the lawoffices.net website, but provides no further evidence of a customer base. Moreover, Plaintiff provides no evidence that the arguably paltry commissions generated from banner ads is sufficient to establish secondary meaning. *See, e.g., Burke*, 871 F.2d at 596 (finding $2,000,000 in gross sales as insufficient to establish secondary meaning).

### vi. Established place in the market

Regarding factor six, Plaintiff's established place in the market, the parties have presented no evidence on Plaintiff's market share. Plaintiff merely asserts that "his place in the internet marketplace is more established." Pl.'s Mot. Summ. J. at 14. Plaintiff provides no evidence to this effect, beyond the ranking of lawoffices.net in certain internet search engine listings, which is irrelevant to the instant inquiry.

#### vii. Proof of intentional copying

██ Courts have presumed secondary meaning in instances where a defendant intentionally, and often admittedly, copied a plaintiff's mark or trade dress. *See, e.g., Ferrari v. Roberts,* 944 F.2d 1235, 1239 (6th Cir.1991) (defendant admitted to intentionally copying Ferrari design); *McNeil–PPC, Inc. v. Guardian Drug Co., Inc.,* 984 F.Supp. 1066, 1069 (E.D.Mich. 1997); *DAP Prods., Inc. v. Color Tile Mfg., Inc.,* 821 F.Supp. 488, 492 (S.D.Ohio 1993). However, proof of intentional copying alone is not sufficient to establish secondary meaning. *See Libbey Glass,* 61 F.Supp.2d at 708. Such proof serves only to raise a rebuttable presumption of secondary meaning. *See id.* Proof of some logical reason, other than an intent to capitalize on a plaintiff's mark, is sufficient to rebut the presumption. *See id.*

Plaintiff devotes considerable time attempting to establish that Defendants were cognizant of LawOffices.net when selecting *Law* office.com as the designation for the West Legal Directory website, an assertion contested by Defendants. Without recounting all of the parties' arguments, the Court notes that even if Defendants were aware of the existence of Plaintiff's mark, Defendants offer a "logical reason" for copying the mark and thus successfully rebut the presumption. Specifically, Defendants explain the process through which they considered "a variety of existing and potential Internet domain names as candidates for re-naming and expanding the services then offered through the West Legal Directory Web site," located at www.wld.com. Defs.' Mem. P. & A. at 5. Defendants submit that they selected the lawoffice.com domain name and mark because they "more readily conveyed to consumers the nature of the legal information and services offered by West." *Id.*

Moreover, Plaintiff provides no evidence as to Defendants' alleged motivation in copying Plaintiff's mark. "Intentional copying ... is not actionable under the Lanham Act 'absent evidence that the copying was done with the intent to derive a benefit from the reputation of another.'" *Ferrari,* 944 F.2d at 1242–43 (quoting *Zin-Plas Corp. v. Plumbing Quality AGF Co.,* 622 F.Supp. 415, 420 (W.D.Mich.1985)). "'Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out.'" *Id.* (quoting *West Point Mfg. Co. v. Detroit Stamping Co.,* 222 F.2d 581, 586 (6th Cir.1955)). In the instant action, Plaintiff has produced no evidence as to the existence or value of his business' goodwill, and provides no rationale for the alleged copying of Plaintiff's mark. Plaintiff provides no explanation as to why a leviathan such as West would benefit from capitalizing on the reputation of a small business with no customer base.

#### viii. Summary of secondary meaning analysis

Because of the short period of use, irrelevant customer testimony, limited advertising expenditures, limited number of customers, limited sales, and lack of any compelling evidence indicating that any of the Defendants knew of Plaintiff's mark, let alone intentionally copied Plaintiff's mark with an intent to capitalize on Plaintiff's goodwill, the Court determines that Plaintiff has not presented sufficient evidence to raise a genuine issue of material fact as to whether potential customers would identify LawOffices.net with the specific suite of services offered specifically by Plaintiff. *See Herman Miller,* 270 F.3d at 314 (stating that "[s]econdary meaning is proven, when, by a preponder-

ance of the evidence, 'it can be determined that the attitude of the consuming public toward the mark denotes a single thing coming from a single source' ") (quoting *Burke*, 871 F.2d at 596). While courts have been willing to find secondary meaning in the absence of consumer surveys and with limited direct consumer testimony, those courts generally have required at least long-term use, extensive advertising, and substantial publicity. *See, e.g.*, *Herman Miller*, 270 F.3d at 315–16. As Plaintiff has failed to demonstrate that LawOffices.net has acquired secondary meaning, the Court will grant summary judgment to Defendants on Counts I–VI. However, the Court is still left to dispose of the parties' motions as to Count VII.

### D. Count VII—Common law misappropriation

In Count VII, Plaintiff alleges that "Defendants have appropriated the trade value of the lawoffices.net mark in a manner that constitutes reaping where he has not sown, and seeks to take a free ride from the Plaintiff's promotion of the lawoffices.net mark and website." Compl. ¶ 90 at 12. Defendants assert that Count VII is a claim for unfair competition and accordingly should be disposed of pursuant to federal trademark principles as applied to analogous state claims. Defs.' Mem. P. & A. at 7, n.5. Plaintiff asserts that facts pertaining to this claim are disputed and thus summary judgment is not appropriate on Count VII.

As support for their position that Plaintiff's misappropriation claim should be analyzed as an unfair competition claim, Defendants cite to *George P. Ballas Buick–GMC, Inc. v. Taylor Buick, Inc.*, 449 N.E.2d 805, 5 Ohio Misc.2d 16 (1981), *aff'd*, 449 N.E.2d 503, 5 Ohio App.3d 71 (1982), in which Defendants assert that the court "label[ed] plaintiff's claim under § 4165.02 as 'misappropriation claim.' " Defendants' reliance upon *Taylor Buick* is misplaced.

First, in *Taylor Buick*, the plaintiff pleaded a claim pursuant to the ODTPA, in support of which plaintiff contended, *inter alia*, "that the defendants misappropriated its research, design and advertising by copying . . . its advertising design on . . . [a] billboard thereby appropriating plaintiff's property rights in this design." *Taylor Buick*, 449 N.E.2d at 808. The court did not hold that misappropriation claims are to be treated as ODTPA claims. The court merely endorsed plaintiff's reliance upon the ODTPA as "well-founded" based upon the court's review of the "confusion of source" provisions of the ODTPA. This determination is far from a conclusion that misappropriation claims are to be treated as ODTPA or other unfair competition claims.

Second, the ODTPA itself provides that "[t]his section does not affect unfair trade practices that are otherwise actionable at common law or under other sections of the Revised Code." Ohio Rev.Code § 4165.02(C).

Third, the cases are distinguishable on their respective facts. In *Taylor Buick*, the plaintiff alleged that "the defendants misappropriated its research, design and advertising by copying and duplicating its advertising design on . . . [a] billboard thereby appropriating plaintiff's property rights in this advertising design." *Taylor Buick*, 449 N.E.2d at 807. Plaintiff also alleged infringement upon his common law service mark. In the instant action, Plaintiff alleges appropriation of a much more amorphous concept, *i.e.*, "the 'trade value' of the lawoffices.net mark," Compl. ¶ 90 at 12, a term which this Court construes as encompassing Plaintiff's good will, reputation, labor, business methods, and other intangibles that are not otherwise protectable by trademark law.

In the instant action, the Court admittedly finds no Ohio case discussing the

misappropriation of "trade value." However, Ohio courts have recognized a separate tort of misappropriation in other contexts, such as misappropriation of trade secrets and misappropriation of another's name or likeness. Notably, the allegations in Count VII closely resemble a common law cause of action recognized in other states and acknowledged in this Circuit, namely the misappropriation of advertising matter and business methods. Relying upon Supreme Court precedent and the common law of misappropriation as developed in numerous states, this Circuit has concluded that "there has been, and perhaps continues to be, a body of law which gives meaning to the term 'misappropriation of advertising ideas or style of doing business.'" *Advance Watch Co. v. Kemper Nat. Insurance Co.*, 99 F.3d 795, 802 (6th Cir.1996). The court in *Advance Watch* further clarified that "'[m]isappropriation of advertising ideas or style of doing business' does not necessarily refer only to the common-law tort of misappropriation recognized by the Supreme Court in *International News Service v. Associated Press*, ... but we conclude, it does refer to the unauthorized taking or use of interests other than those which are eligible for protection under statutory or common-law trademark." *Id.; see also Circle Communications, Inc. v. Hinton*, No. A–746778, 1975 Ohio Misc. LEXIS 43, at *9, *17, 74 Ohio Op.2d 356 (June 2, 1945) (recognizing that the Supreme Court has distinguished misappropriation as a separate cause of action, which "adopts protectable 'quasi-property' values to such things as ideas, information, formulas, designs, and artistic creations").

While the Court makes no determination as to whether Plaintiff has successfully pled a cause of action for this tort, the Court notes that Defendants offer no grounds for summary judgment on this count, other than their claims as to the status of Plaintiff's trademark. *See Advance Watch*, 99 F.3d at 805 (distinguishing between trademark infringement on the one hand, and "misappropriation of advertising ideas or style of doing business" on the other, and noting that "it is common practice, but not legally precise, to refer to 'misappropriation' of a trademark"). As the Court has no reason to determine that the Ohio Supreme Court would not recognize this cause of action, the Court will deny Defendants' motion for summary judgment on Count VII.

### E. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment only on Counts I–IV of the Complaint, but asserts that summary judgment is inappropriate as to Counts V–VII. As discussed above, Plaintiff cannot maintain a cause of action on Counts I and III–VI because his mark is descriptive, but devoid of secondary meaning, and thus not entitled to trademark protection. In addition, Plaintiff has withdrawn Count II of the Complaint. Accordingly, the Court will deny Plaintiff's motion in its entirety.

### III. CONCLUSION

Based upon the foregoing, the Court will grant Defendants' Motion for Summary Judgment (Doc. No. 50) as to Counts I—VI. However, the Court will deny Defendants' motion as to Count VII. Finally, the Court will deny Plaintiff's Motion for Summary Judgment (Doc. No. 55) in its entirety. Therefore, the sole cause of action that remains is Count VII, Plaintiff's claim for common law misappropriation.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Defen-

**920**

dants' Motion for Summary Judgment (Doc. No. 50) is granted as to Counts I—VI and denied as to Count VII

IT IS HEREBY FURTHER ORDERED, ADJUDGED and DECREED that Plaintiff's Motion for Summary Judgment (Doc. No. 55) is denied in its entirety.